UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| SERENITY POINT RECOVERY, INC., A FOREVER RECOVERY, BEHAVIORAL REHABILITATION SERVICES, BEST DRUG REHABILITATION,<br><br>       Plaintiffs,<br><br>v.<br><br>BLUE CROSS BLUE SHIELD OF MICHIGAN,<br><br>       Defendant. | Case No.<br><br>Hon.<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

COMES NOW, Plaintiffs SERENITY POINT RECOVERY, INC., A FOREVER RECOVERY, INC., BEHAVIORAL REHABILITATION SERVICES and BEST DRUG REHABILITATION (Plaintiffs), who complain against Defendant BLUE CROSS BLUE SHIELD OF MICHIGAN, (BCBSM or Defendant) as follows:

### I.    INTRODUCTION

1.    The United States and the State of Michigan are in the midst of a worsening opioid epidemic, so much so that both the President and the Governor have declared emergencies. In 2016 and 2017 there were at least 5,041 reported deaths in Michigan from overdose[1]. In 2017, 7 Michiganders died each day from overdose, slightly more than 1 out of every 4,000 residents[2].

---

[1] Centers for Disease Control and Prevention, National Center for Health Statistics, Stats of the State of Michigan, https://www.cdc.gov/nchs/pressroom/states/michigan/michigan.htm (last updated April 11, 2018).
[2] https://www.cdc.gov/mmwr/volumes/67/wr/mm675152e1.htm?s_cid=mm675152e1_w#F1_down

Opioid deaths currently exceed the rate of homicides and deaths from firearms, combined, in Michigan[3]. Similarly, deaths related to alcohol and other drugs in Michigan have skyrocketed[4].

2. In the face of this public crisis, the state's largest health insurer, Blue Cross Blue Shield of Michigan (BCBSM), has slashed reimbursement rates paid to inpatient and outpatient substance abuse treatment facilities without notice or justification. These rates fall far below the actual costs of providing services. Meanwhile, in 2018, Blue Cross Blue Shield of Michigan paid its CEO a record breaking $19.2 million while reporting profits of $580 million on revenues of $29.3 billion.[5]

3. As a direct result of these unjustified and artificially low reimbursement rates, private substance abuse treatment providers across Michigan have had to reject patients. In other cases, patients complete treatment only to receive surprise bills in the tens of thousands of dollars for services that they thought were covered.

4. Plaintiffs here have met with BCBSM repeatedly to address these concerns and advocate on behalf of patients, however these pleas have fallen on deaf ears. While BCBSM and its executives enjoy astronomical returns, many of their plan members are literally dying in the streets while desperately needed treatment programs are shutting their doors. BCBSM executives would rather pay themselves than pay for lifesaving substance abuse treatment for their insureds. Plaintiffs, and the network to which they belong, provided 1,000 beds for the treatment of substance abuse and mental health. This lawsuit involves claims related to at least 4,066 of the patients they treated, all of whom were insured by Blue Cross Blue Shield.

---

[3] https://www.cdc.gov/nchs/pressroom/states/michigan/michigan.htm

[4] Bouffard, Karen. "Michigan's 'Preventable' Deaths Set to Soar 44%." Detroit News, DetroitNews, 21 Nov. 2017, www.detroitnews.com/story/news/local/michigan/2017/11/21/michigan-drug-suicide-deaths-soar/107918408/.

[5] https://www.detroitnews.com/story/business/2019/03/01/pay-boost-for-ceo-blue-cross-blue-shield-michigan/3026788002/

## II.   JURISDICTION

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132 as Plaintiff brings claims as assignee and / or under a valid durable power of attorney for claims arising under ERISA.

6.      This Court also has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

## III.   VENUE

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims brought herein occurred in the Western District of Michigan.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(d) because BCBSM is subject to personal jurisdiction within the state and has sufficient contacts with the Western District of Michigan to subject it to personal jurisdiction if the district were a separate state.

9.      Venue is also proper pursuant to 29 U.S.C. § 1132(e)(2) as the breaches giving rise to the claims brought herein occurred in the Western District of Michigan.

## IV.   PARTIES

10.      At all times material hereto, SERENITY POINT RECOVERY, INC. (hereinafter, SPR) was a Michigan licensed substance abuse treatment facility, and is a corporation organized under the laws of the state of Nevada, that treated individuals suffering from substance abuse and co-occurring mental health disorders, among other conditions, with a registered office mailing address at 2222 West Grand River Ave., Suite A, Okemos, MI  48864.

11.      At all times material hereto, A FOREVER RECOVERY, INC. (hereinafter, AFR) was and is a Michigan licensed substance abuse treatment facility, and a corporation organized

under the laws of the state of Michigan, that treated and actively treats individuals suffering from substance abuse and co-occurring mental health disorders, among other conditions, with a registered office mailing address at 2222 West Grand River Ave., Suite A, Okemos, MI  48864.

12.    At all times material hereto, BEHAVIORAL REHABILITATION SERVICES, INC. (hereinafter, BRS) was and is a Michigan licensed substance abuse treatment facility, and a corporation organized under the laws of the state of Nevada, that treated and actively treats individuals suffering from substance abuse and co-occurring mental health disorders, among other conditions, with a registered office mailing address at 355 W Mannsiding Rd., Harrison, MI 48625.

13.    At all times material hereto, BEST DRUG REHABILITATION, INC. (hereinafter, BDR) was and is a Michigan licensed substance abuse treatment facility, and a corporation organized under the laws of the state of Nevada, that treated and actively treats individuals suffering from substance abuse and co-occurring mental health disorders, among other conditions, with a registered office mailing address at 2222 West Grand River Ave., Suite A, Okemos, MI 48864.

14.    At all times material hereto, BLUE CROSS AND BLUE SHIELD OF MICHIGAN (BCBSM or Defendant) is and was a Michigan health care corporation organized under the Nonprofit Health Care Corporation Reform Act, MCL 550.1101, *et seq*. BCBSM is a health insurance company with headquarters at 600 E. Lafayette Blvd, Detroit, MI 48226.

## V.    BACKGROUND

### General Background

15.    Plaintiffs are a group of commonly-owned inpatient and outpatient substance use treatment centers with facilities in Michigan. Plaintiffs' centers are fully licensed with the State of

Michigan Licensing and Regulatory Affairs and accredited with CARF, the Commission on Accreditation of Rehabilitation Facilities. [6] Collectively, Plaintiffs employ over 500 people in the State of Michigan. Several of the centers are also accredited with JCAHO, the Joint Commission on Accreditation of Healthcare Organizations, the same organization that accredits large hospitals.

16.     Plaintiffs have treated and continue to actively treat patients suffering from substance abuse and mental health disorders and provide Inpatient Detoxification, Residential, Partial Hospitalization and Intensive Outpatient levels of care, in addition to ancillary services such as treatment planning, aftercare, community outreach and other such healthcare related services.

17.     Patients suffering from the disease of addiction are a unique population that require long-term specialized treatment and care.

18.     Patients from across the nation have sought out the services of Plaintiffs because of Plaintiffs' long-term, full spectrum of care, programs that allow patients to recover in a secure and safe environment with trained professionals and a history of excellent outcomes.

19.     Plaintiffs bill insurance companies, including BCBSM, for the services rendered to patients. The centers are out-of-network (OON) / non-participating providers with BCBSM and all other Blue Cross and Blue Shield (BCBS) plans nationally . As such, there is no written provider agreement between the providers and BCBSM or BCBS.

20.     In 2017, one of the Plaintiffs, BDR, reluctantly joined BCBSM's Traditional Network of participating providers, in an effort to address the problems outlined in this Complaint. Plaintiffs' treatment centers have served thousands of patients since its inception.

---

[6] This refers to centers that are currently operational, as SPR is no longer operation. All centers were appropriately licensed and CARF accredited at the time services were rendered that are at issue in the Complaint.

21.    All of the claims which form the basis for this lawsuit derive from Preferred Provider Organization (PPO) health plans. PPO health plans pay OON health benefits, meaning the provider does not have to be in network with BCBSM for coverage to be available. All of the patients whose claims form the basis of this lawsuit had active PPO health plans with coverage for the treatment for substance abuse and mental health disorders when services were rendered.

### Plaintiffs' Intake and Claims Procedures

22.    Before admission to any of Plaintiffs' facilities, Plaintiffs verify active coverage for OON substance abuse and mental health services with each patient's health insurer through a verification of benefits (VOB) process that involves a documented phone call to the health plan, such as BCBSM. During the VOB process, the Plaintiffs inquire as to the reimbursement rate owed under the health plan and the patient's out of pocket costs, such as deductible, co-insurance and out of pocket amounts.

23.    At the time of admission and during a patient's stay, Plaintiffs obtained prior authorization to provide services through the pre-authorization/utilization review (UR) process - which is the process during which medical information regarding a patient is provided to the health plan and the plan, in turn, pre-authorizes services if they are deemed medically necessary.

24.    During this process, the plan makes specific representations regarding the level of care it authorizes and the duration for which it will authorize such services. Providers rely upon these assurances that the services are covered under the terms of the plan and medically necessary as they agree to treat patients because of them.

25.    The following are examples of specific representations that BCBS agents made to the Plaintiffs in this case prior to admission of each patient whose claims underlie this action, during the VOB process.  The names of individual patients have been replaced with numbers to

6

protect their identities. Because of the protected health information contained in these records, Plaintiffs will make available to Defendants the names of these sample patients, and of all patients, whose claims underlie this action either under seal or upon entry of a protective order in this matter:

A.  (Patient 8424) On 6/30/2016 BCBS agent Traci stated to Plaintiff's representative that: Patient 8424 was covered for out-of-network substance abuse treatment; that claims would be processed by the Local BCBS entity (BCBSM); and that the member's policy would pay claims at 70% of the Usual, Customary or Reasonable rate until the patient met his/her out-of-pocket maximum, at which point the plan would reimburse 100% of the Usual, Customary or Reasonable rate. Defendant's agent gave the reference number I-7082529 for the call.

B.  (Patient 11048) On 02/03/2017 BCBS agent Matthew stated to Plaintiff's representative Brandy F that: Patient 11048 was covered for out-of-network substance abuse treatment; that claims would be processed by the Local BCBS entity (BCBSM); and that the member's policy would pay claims at 60% of the Usual, Customary or Reasonable rate until the member met his/her out-of-pocket maximum, at which point the plan would reimburse 100% of the Usual, Customary or Reasonable rate. Defendant's agent gave the reference number.

C.  (Patient 9599) On 08/01/2016 BCBS agent Sherice stated to Plaintiff's representative Brandy F that: Patient 9599 was covered for out-of-network substance abuse treatment; that claims were processed by the local BCBS entity (BCBSM); and that the member's policy would pay claims at 80% of the Usual, Customary or Reasonable rate until the member met his/her out-of-pocket maximum, at which point the plan would reimburse

100% of the Usual, Customary or Reasonable rate. Defendant's agent gave the reference number "Sharice 08012016" for the call.

D. (Patient 462) On 12/01/2016 BCBS agent Amanda M stated to Plaintiff's representative Tea W that: Patient 462 was covered for out-of-network substance abuse treatment; that claims were processed by the local BCBS entity (BCBSM); and that the member's policy would pay claims at 60% of the Usual, Customary or Reasonable rate until the member met his/her out-of-pocket maximum, at which point the plan would reimburse 100% of the Usual, Customary or Reasonable rate. Defendant's agent gave the reference number "Amanda V 12012016" for the call.

26. Similarly, the following examples are representative of specific representations Defendant's agents specifically made to Plaintiffs during routine UR calls. Depending on the requirements of the health plan, Plaintiffs would make authorization calls every 3-5 days to receive approval to continue providing services for each and every patient:

A. (Patient 8424) On 07/06/2016, 07/08/2016, 07/12/2016, and 08/02/2016 Defendant's agent C Lopez authorized Plaintiff to render 7 days of RTC[7] services, 4 days of RTC services and 30 total days of PHP[8] services for Patient 8424 pursuant to authorization number 7448519. Plaintiff rendered services in reliance upon these authorizations.

B. (Patient 11048) On 02/07/2017, 02/15/2017, 02/17/2017, and 03/10/2017 Defendant's agent Chad Vargas authorized Plaintiff to render 7 days of DTX[9] services, 7 days of RTC services, 15 days of PHP services, and 15 days of IOP[10] services for Patient 11048

---

[7] RTC = Residential Inpatient Treatment
[8] PHP = Partial Hospitalization Program Treatment
[9] DTX = Detoxification Treatment
[10] IOP = Intensive Outpatient Treatment

pursuant to authorization numbers 399361717 and 399460809. Plaintiff rendered services in reliance upon these authorizations.

C.  (Patient 9599) On 08/01/2016 and 08/03/2016 Defendant's agents Robin Brook and Jorge Herreria authorized Plaintiff to render 4 days of DTX services and 7 days of RTC services for Patient 9599 pursuant to authorization numbers 7472647 and 7474636. Plaintiff rendered services in reliance upon these authorizations.

D.  (Patient 462) On 12/5/2016, 12/12/2016, 12/15/2016, 12/20/2016, and 01/09/2016 Defendant's agent Rhonda T. authorized Plaintiff to render 10 days of DTX/RTC services, 8 days of RTC services, 15 days of PHP services and 15 days of IOP services to Patient 462 pursuant to authorization number 247373102. Plaintiff subsequently rendered services in reliance upon these authorizations.

27.     Plaintiffs kept and continue to keep meticulous records of all VOB and UR calls. Plaintiffs relied upon and provided services to patients based wholly on the representations made during these calls.

28.     All patients who received or currently receive treatment at Plaintiffs' facilities execute a notarized, durable power of attorney and endorse a separate assignment of benefits form to the respective facility, permitting Plaintiffs to stand in the shoes of their patients with the same rights to appeal, litigate and receive payment under the health plan as the patients themselves. Samples of these two forms are attached as **Exhibit A**. Each of the facilities which are Plaintiffs to this lawsuit completed forms identical to these in the ordinary course of business. Each patient whose claims underlie this lawsuit executed both a durable power of attorney and an assignment of benefits identical to the samples attached hereto.

29.     During receipt of services up through discharge, Plaintiffs submit claims to Defendant using a standard industry form called a "UB04" for facility-based services to the applicable health plan, including but not limited to BCBS and BCBSM. All patient claims which form the basis for this lawsuit were originally timely submitted to BCBSM using a UB04 form.

### Plaintiffs' Experience with BCBSM

30.     All patients whose claims underlie this lawsuit were insured by PPO policies issued by a BCBS entity.

31.     As described on the Blue Cross Blue Shield Association website, "The Blue Cross Blue Shield Association is a national association of 36 independent, community-based and locally operated Blue Cross Blue Shield companies."[11] These companies include the 14 Anthem companies. Through the BlueCard program, BCBS plans each hold themselves out as offering a single point of contact for providers for all BCBS plans nationwide via a provider's "local" BCBS plan, i.e., the BCBS entity covering the region in which the healthcare provider is physically located. Healthcare providers are instructed to submit claims for patients from other BCBS plans through a healthcare provider's local BCBS entity. Hence, in Michigan, all healthcare providers submit claims for any BCBS plan from anywhere in the nation to BCBSM. The BlueCard program requires the "local" BCBS plan to be responsible for any provider-related functions such as all claims processing, payment, customer service issues, adjustments, and appeals, regardless of which BCBS plan a patient may have. Here, the "local" plan responsible for all of these functions for Plaintiff and its patients was and is, at all times, BCBSM.

32.     Some patients treated by Plaintiffs were Michigan residents and had coverage directly through BCBSM.

---

[11] https://www.bcbs.com/the-blue-cross-blue-shield-system

33.     Other patients had health coverage from other BCBS entities in other parts of the country, such as Anthem BCBS of Ohio or Anthem BCBS of Indiana. All of these PPO plans provided OON coverage accessible nationwide through the BlueCard program for substance abuse and mental health services. In such instances, BCBSM is referred to as the "local" plan for processing payments and Anthem BCBS of Ohio or Anthem BCBS of Indiana, which provided the insurance through the BlueCard program is referred to as the "home" plan.

34.     BlueCard plans, when functioning as the "local" plan, are required to pay benefits per the terms of the "home" plan reimbursement schedule, which may be a different reimbursement schedule than that used by the "local" plan. In all instances, it is the reimbursement schedule specified by the  "home" plan, or rates as defined within the plan documents issued by the "home" plan, which control.

35.     Plaintiffs have faced ongoing and continuous claims processing and payment issues specifically with BCBSM for a period of more than 4 years. The issues outlined in this Complaint are systematic attempts by BCBSM to avoid payment of valid claims to OON providers and also to circumvent the reimbursement requirements of patient "home" plans

36.     By way of background, on or about October 2008, Plaintiff, AFR, began submitting claims for patients it treated with coverage for OON substance abuse and mental health coverage to BCBSM. All claims were timely filed.

37.     On or about October 2011, Plaintiff, BDR, began submitting claims for patients it treated with coverage for OON substance abuse and mental health coverage to Defendant. All claims were timely filed.

38.     Claims for these facilities were submitted in accordance with the BCBS, BlueCard program and industry standard billing guidelines on a UB04 form. As is industry practice, the

claims for inpatient detoxification, residential, partial hospitalization and intensive outpatient services were submitted to BCBSM as an all-inclusive, per diem service billed using a standard revenue code for facility-based substance abuse and mental health services.

39.     Defendant failed to process these claims and often rejected claims on the basis that AFR and BDR were OON providers even though the patients were covered by BCBS "home" plans that explicitly provided benefits to be paid to OON providers. It was later discovered by Plaintiff and disclosed by Defendant that the real issue had been that BCBSM did not have staff, processes or systems in place to accept claims for out-of-state members with OON benefits and process them through the Blue Card program, so instead it denied the claims wholesale.

40.     This was not an isolated event. BCBSM has historically been unreliable in processing claims. For a period of over two years, BCBSM would not process Plaintiffs' claims because Plaintiffs' facilities were OON providers. This despite the fact that all claims submitted to ll BCBSM were for PPO "home" plans that were part of the BlueCard program and explicitly provided OON benefits.

41.     Eventually, after much negotiation, BCBSM agreed to process claims but only via paper submissions through the US Mail. This is a highly unusual billing practice in modern healthcare. In fact, even with BCBSM at this time, in-network facilities were permitted to submit claims electronically. It was, apparently, only because Plaintiffs were OON substance abuse and mental health providers that their claims needed to be submitted on paper by US Mail.

42.     Upon information and belief, BCBSM is one of the only insurers in the entire country that does not permit the submission of claims via an electronic portal for OON substance abuse and mental health  treatment facilities. To this day, all claims for such OON facilities are still required to be submitted via paper claims and sent via US Mail or Federal Express.

Additionally, BCBSM will not provide OON substance abuse and mental health facilities such as Plaintiffs with Explanation of Benefits (EOBs) or provide electronic access to EOBs. BCBSM only provides a payment remittance which does not include claim detail information or denial information, which is necessary for providers to submit appeals.

43.     Additionally, from April 2016 to July 2016 there was precipitous decline in the reimbursement rates paid by BCBSM for each level of care per day as detailed below:

**BCBS OF MICHIGAN RATES BY MONTH BY YEAR**

| Level of Care | April 2016 | May 2016 | June 2016 | July 2016 |
|---|---|---|---|---|
| Detoxification(Inpatient) | $1,244.00 | $841.00 | $640.00 | $151.18 |
| Residential (Inpatient) | $1,313.00 | $770.00 | $451.00 | $151.18 |
| PHP (Outpatient) | $795.00 | $600.00 | $394.00 | $201.30 |
| IOP (Outpatient) | $730.00 | $415.00 | $412.00 | $118.76 |

44.     BCBSM also stopped paying some claims altogether during the same time, seemingly without reason or explanation. Since July of 2016, BCBSM has accrued not less than $10 million dollars in completely unpaid claims from Plaintiffs. This consists of claims that BCBSM failed to process and at least 22,000 claims which were underpaid and/or improperly processed, which BCBSM is currently requiring to be re-processed by hand-filed paper submissions.

45.     Plaintiffs have filed the necessary appeals permitted under the health plans with BCBSM and attended multiple face-to-face meetings with executives and attorneys of BCBSM. As evidenced by the facts below, further attempts to exhaust appeals and administrative remedies would be futile.

46.     This process has been dragging on for years. During the first meeting regarding the issues above, on or about September 2016, BCBSM executives stated they had "no idea" that the

reimbursement rates were reduced and "needed time" to conduct an investigation. In the second meeting, on or about March 17, 2017, BCBSM informed Plaintiffs that the "new" rates BCBSM was using were the standard "in-network rates" paid to all substance abuse treatment providers in Michigan, regardless of network status. BCBSM indicated that both in-network claims and OON claims would now only reimburse at the in-network rates, despite explicit language in health plans which pays markedly higher rates for OON services[12].

47.     Further, in March 2017, BCBSM informed Plaintiffs that they had changed the way claims needed to be billed and now required "unbundled" billing from then on. Previously, all claims were billed with a revenue code at a per diem, all-inclusive rate for a facility service, as is standard industry practice[13]. BCBSM changed this requirement and was now requiring that all services be unbundled and billed for each individual service provided[14]. Upon information and belief, BCBSM is the only BlueCard program member to require facility/institutional claims to be billed this way. So, rather than a claim being sent to BCBSM with a single all-inclusive, per diem code per date of service, invoices would now require dozens of lines of codes for the various services provided to patients throughout a treatment day (i.e. room & board, group therapy, nursing, medication, counseling, education, doctor visits, charting, etc.).

48.     There was no OON provider network notification regarding this change and, to-date, BCBSM has not provided any written publication regarding the "new" billing requirements. Upon information and belief, this change occurred internally within BCBSM sometime in mid-

---

[12] Under the BlueCard program, to which all BCBS belong, when an out-of-state BCBS insured seeks treatment in Michigan, the claim is processed by BCBSM even though the insured has a plan issued by a BCBS health plan in another state. The health plan documents require that reimbursement be paid at the rate specified in the health plan. However, since June 2016, BCBSM has ignored this requirement and paid either at its own rate, a partial rate or at no rate at all.
[13] E.g. $1,244 per day.
[14] E.g. $150.00 for a physician visit, $150.00 for a bed, $150 for medication etc.

2016. Approximately 9 months or more after this internal change, BCBSM finally informed Plaintiffs of the change in billing requirements. This resulted in the mishandling of thousands of claims submitted by Plaintiffs to BCBSM.

49.     At the March 17, 2017 meeting, as a result of the failure of BCBSM to notify Plaintiffs of the change in its anomalous billing requirements, BCBSM agreed to engage in settlement discussions with Plaintiffs to settle the amount "underpaid" or paid at lower rates because of the billing guidelines change and to provide information to Plaintiffs about the new billing guidelines.

50.     It was discussed that a test batch of 50 claims should be filed first to test the new BCBSM processing system. Of the 50 test claims, there were multiple processing and claims information issues including, but not limited to, when Plaintiffs called BCBSM regarding the claims, their representatives were told the claims were not on file, illegible or that the claims were keyed into the system incorrectly. Plaintiffs also experienced a litany of other problems with the test batch of claims.

51.     While the issues regarding the test claims were being addressed, multiple correspondences, phone calls, and requests went back and forth between Plaintiffs and BCBSM regarding the pre-existing underpaid claims. Plaintiffs asked BCBSM if they would reprocess the claims in the electronic system instead of requiring all the claims to be rebilled with manual paper filings. That request was denied.

52.     Plaintiffs subsequently requested BCBSM, at the very least, enter into an agreement wherein they would agree to reprocess the claims at issue and not deny claims for untimely filing[15].

---

[15] The claims were untimely due to the delays caused by BCBSM through this process.

53.     After numerous attempts at resolution, a proposed settlement agreement was prepared by Plaintiffs and sent to BCBSM. This proposal was rejected by BCBSM even though the basic terms had been agreed upon in advance by BCBSM executives.

54.     Ultimately, BCBSM indicated to Plaintiffs that they had no obligation to assist with any claims processing and refused to provide any help or guidance to Plaintiffs in the submission and/or re-submission of any claims.

55.     To date, all settlement discussions and attempts to resolve the multiple issues facing Plaintiffs have been rejected or failed, necessitating this suit.

56.     In a further attempt to be able, financially, to provide services to BCBS members, Plaintiffs asked BCBSM if they could be a participating provider or in-network provider. As such, Plaintiffs would finally be able to submit claims to BCBSM electronically.

57.     In response to this request, in the Summer of 2017, BCBSM's legal department provided the contact information for the person responsible for in-network contracting at BCBSM. They also advised Plaintiffs of the forms that should be completed for credentialing. One Plaintiff facility, BDR, applied as a test to ensure that the process worked. The application to request credentialing was completed and submitted.

58.     To its surprise and dismay, BDR was subsequently informed that: 1) once the provider submitted the application the contract would take automatically take effect, 2) that the contract was one of adhesion, 3) that neither the contract nor the rates were negotiable, and 4) that the in-network contract only applied to the to the BCBSM Traditional Network, not the Blue Care Network (BCN) which insures most in-state Michigan residents with BCBSM plans.

59.     Even after BDR joined the network and had access to WEBDENIS, the electronic claims submission portal, BCBSM repeatedly failed and refused to process over $6 million dollars in earlier pre-contracting claims which were re-submitted by BDR.

60.     Altogether, these facts present a pattern of obfuscation, delay, misrepresentation, and/or incompetence that has caused millions of dollars of damage to Plaintiffs. These facts also constitute gross violations of the law by BCBSM.

**Defendant's Actions Continually Wasted Plaintiffs' Resources and Prevented Plaintiffs from Receiving Payment for Valid Claims**

61.     Claims submitted for payment to BCBSM through the BlueCard program are required to honor the plan terms of every patient's specific "home" health plan, including that plan's rate of reimbursement for services.

62.     On or about March 2014, Plaintiff, BRS, began submitting claims for patients it treated with verified coverage for OON substance abuse and mental health services to BCBSM as the appropriate "local" plan. All claims were timely filed.

63.     On or about June 2015, Plaintiff SPR began submitting claims for patients it treated with verified coverage for OON substance abuse and mental health services to BCBSM as the appropriate "local" plan. All claims were timely filed.

64.     Despite the processing issues previously described, Plaintiffs' claims that did process prior to April 2016, submitted to BCBSM as the "local" plan, were properly processed and paid in accordance with the "home" health plans' terms by BCBSM.

65.     Starting on or about April 2016 through July 2016, Plaintiffs noticed a significant decline in the rate of reimbursement for these out of state BCBS "home" health plans.

66.     As a custom and practice, Plaintiffs would timely appeal for reconsideration all claims that were denied or underpaid and did so in their **second** re-submission of these claims to BCBSM.

67.     After years of good faith negotiations on the part of Plaintiffs to resolve the issues of denied, underpaid, and/or incorrectly processed claims, Plaintiffs tried to satisfy BCBSM's new billing guidelines, a constantly shifting target, and in March 2017 undertook the tedious task of unbundling per diem services in accordance with BCBSM's new billing guidelines.

68.     Plaintiffs resubmitted thousands of corrected claims on paper via US Mail, this now being the **third** re-submission of Plaintiffs' claims, at BCBSM's behest.

69.     Upon resubmission of these "corrected" claims, Plaintiffs were then advised that claims were not being processed by BCBSM because the scanner that received the claims was putting a line down the page, causing the claims to be illegible to their system and therefore rejected. Plaintiffs then reprinted and resubmitted these several thousand claims again, this now being their **fourth** re-submission of these claims.

70.     Plaintiffs expended thousands of man hours calling BCBSM regarding each denied claim to request the original internal BCBS number for the original claim. Plaintiffs then rebilled a **fifth** re-submitted and corrected claim, again via paper and US Mail, to BCBSM. These claims, however, were not paid because, Plaintiffs were told, the internal BCBSM claim numbers that BCBSM required Plaintiff to include on the claims  was not the original claim number and therefore not matching in the system. . Plaintiffs later learned that the BCBSM's representatives did not all have access to the full claim submission history and were at times providing the Plaintiffs the second, third and even fourth, claim number as the original claim number, thus sabotaging Plaintiffs' efforts to have the claims processed and paid.

71.     The cycle of refusing claims because of BCBSM's representatives not being able to provide the original internal claim number was again brought to the attention of the executives of BCBSM. BCBSM agreed to provide, as a special project, the original internal claim numbers for these claims.

72.     On or about February 15, 2019, Plaintiffs received the report with the original claim numbers, more than 2 years from the date that the issue was first brought to BCBSM's attention.

73.     Plaintiffs again resubmitted these claims for the **sixth** time, again via paper, with the new claim numbers provided by BCBSM who then promptly denied the claims as not being timely filed.

74.     BCBSM placed Plaintiffs in a situation that can best be described as Kafkaesque. As a direct consequence of not being paid on these claims, Plaintiff SPR was forced to close and the State of Michigan lost an accredited facility with 45 inpatient detoxification beds, 45 residential beds, and 100 spaces for partial hospitalization and intensive outpatient services.

**Defendants Refused to Pay Appropriate Rates and Often Did Not Pay at All**

75.     Since July 2016, the reimbursement rate from BCBSM to Plaintiffs has inexplicably stagnated at approximately $150 per day, even though the Consumer Price Index of goods and services in this country rises at about 2% per year[16]. BCBSM has indicated that this is their "in-network rate" that they pay to all substance abuse and mental health providers. BCBSM's rates are lower than subsidized Medicaid rates for similar services. BCBSM has also stated there is no mechanism or flexibility to negotiate rates now or in the future.

---

[16] Consumer Price Index, 1913-, Federal Reserve Bank of Minneapolis, https://www.minneapolisfed.org/community/financial-and-economic-education/cpi-calculator-information/consumer-price-index-and-inflation-rates-1913 (last visited Jul 25, 2019).

76.     BCBSM's rates are unreasonably low compared to BCBS rates in other states, including Indiana. The in-network rates for Anthem BCBS of Indiana are as follows[17]:

### IN NETWORK ANTHEM BCBS - INDIANA RATES

| Level of Care | Traditional Network | PPO | HMO |
| --- | --- | --- | --- |
| Detoxification (Inpatient) | $920.00 | $920.00 | $782.00 |
| Residential (Inpatient) | $600.00 | $600.00 | $510.00 |
| Partial Hospitalization (Outpatient) | $325.00 | $325.00 | $276.00 |
| Intensive Outpatient (Outpatient) | $180.00 | $180.00 | $153.00 |

77.     The Anthem BCBS of Indiana rates listed above are up to **six times** the current Michigan rates depending on the level of care. Basic economics dictates that the new rates employed by BCBSM are not even sufficient to meet overhead, given the necessary care and facilities required to treat substance abuse and mental health patients properly and maintain accreditation. For example, BCBSM requires providing 24-hour nursing and daily physician visits for detoxification and residential levels of care, but their reimbursement rates do not even begin to cover the costs of actually providing those services.

78.     BCBSM's rates are not commercially reasonable and are designed to eliminate and/or reduce the number of providers in the substance abuse and mental health treatment industry. If there are no providers that will accept their commercially unreasonable rates, then the obligations of the law can be conveniently sidestepped by BCBSM. While their members continue to overdose and die, BCBSM continues to earn record profits, and BCBSM's executives continue to be paid record bonuses, amounts that are absurd even by Silicon Valley standards.

---

[17] All rates are "per diem"

79.     From the period April 2016 onward, claims that were wrongfully denied, underpaid or incorrectly processed by BCBSM total not less than **$40 million dollars**. The spreadsheets detailing these claims encompass 125,530 lines of data, much of it protected by HIPAA. Printed out, these records exceed 400 pages. Although these records are already in the possession of BCBSM, due to the protected health information contained within them, Plaintiffs will provide these records again either under seal or upon the entry of a protective order in this matter.

80.     As mentioned, in July 2018, the financial damages sustained as a result of Defendant's wrongful conduct led to the closure of SPR along with its 45 detox beds, 45 residential treatment beds and extensive partial hospitalization and intensive outpatient service offerings. These desperately needed services are  no longer available to residents of the State of Michigan. Nor are the dozens of Michigan jobs which were supported by that facility.

81.     Notwithstanding the above and BCBSM's ongoing damaging actions, delay tactics, and unconscionable conduct, Plaintiffs have and continue to, in good faith, provide substance use and mental health services to BCBS and in-state BCBSM insureds.

82.     As a result of Defendant's actions, Plaintiffs have suffered and continue to suffer extreme damages.

## VI.    PLAINTIFFS' CAUSES OF ACTION AGAINST DEFENDANT

### Count I – ERISA Action for Unpaid Benefits
### (As attorney-in-fact and assignee of those patient claims subject to ERISA[18])

83.     Plaintiffs re-allege the factual allegations in paragraphs above 16 through 83,  as if fully set forth herein.

---

[18] ERISA plans are those plans that are self-funded by employers, typically large group health plans. Only Defendant has knowledge of which plans herein are subject to ERISA.

84.     Plaintiffs bring Count I pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA").

85.     ERISA is a remedial statute designed to "protect . . . the interests of participants in employee benefit plans and their beneficiaries" by setting forth "standards of conduct, responsibility, and obligation for fiduciaries of plans." 29 U.S.C. § 1001(b). ERISA requires that plan fiduciaries such as Defendant operate plans prudently and in the sole interests of plan participants and beneficiaries, for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable plan expenses, and in accordance with plan terms to the extent that the terms do not otherwise conflict with ERISA. 29 U.S.C. § 1104(a)(1)(A), (B), (D). ERISA also requires plan fiduciaries to provide both adequate written notice of the reasons for any denial of benefits and the opportunity to obtain full and fair review of any denial. *Id*. § 1133.

86.     ERISA provides that plan participants and beneficiaries may bring suit in federal court to enjoin any act that violates Title I of ERISA or the terms of the plan, or to obtain other appropriate equitable relief to remedy any such violation or to enforce any or the provision of Title I or the terms of the plan. *Id*. § 1132(a)(3).

87.     The terms of all ERISA plans include the substantive requirements of ERISA and the Mental Health Parity and Addiction Equity Act (MHPAEA), including requirements for full and fair review of claims, and specific procedural claims-processing requirements.

88.     These provisions require that any benefits for mental health and substance use disorders offered under an ERISA-covered health care plan are on a par with other medical and surgical benefits. 29 U.S.C. § 1185a. MHPAEA forbids plans and plan fiduciaries from imposing more restrictive financial requirements, such as deductions and copayments and treatment

limitations on mental health and substance use disorder benefits more restrictive than other medical and surgical benefits. *Id*. at § 1185a(a)(3)(A)((i)-(ii), (B)(i).

89.     The term 'treatment limitation' includes limits on the frequency of treatment, number of visits, days of coverage, or other similar limits on the scope or duration of treatment. *Id*. at § 1185a(a)(3). Additionally, the MHPAEA regulations explain that ERISA's parity requirements bar not only "quantitative" treatment limitations, which are "expressed numerically," but also "nonquantitative" treatment limitations, which "otherwise limit the scope or duration of benefits for treatment under a plan." 29 C.F.R. § 2590.712(a).

90.     Under ERISA § 502(a)(1)(B), participants are entitled to enforce the terms of the health plans and administer benefits in accordance with said health plans which have resulted in damages for the amount of the claims wrongfully refused or underpaid. To succeed on a claim under 502(a)(1)(B) a plaintiff must show that they are a participant or beneficiary entitled to benefits under the plan, and that those benefits have not been provided. *See Aetna Health Inc. v. Davila*, 542 U.S. 200, 210, 124 S. Ct. 2488, 2496, 159 L. Ed. 2d 312 (2004). A provider's ability to bring suit under ERISA is contingent on the provider's derivative standing. A provider can obtain derivative standing if a valid assignment of benefits grants provider standing for ERISA purposes. *See Brown v. BlueCross BlueShield of Tennessee, Inc.*, 827 F.3d 543, 547 (6th Cir. 2016).

91.     This cause of action seeks to recover benefits due to Plaintiff under the terms of those BCBS health plans which are governed by ERISA, to enforce rights under the terms of the health plans, and/or to clarify rights to future benefits under the terms of the health plans, brought pursuant to ERISA, 29 U.S.C. § 1132(a)(1)(B).

92.     At all material times hereto, Plaintiffs had standing to bring these claims both as the attorney-in-fact for the patients at issue and as an assignees of their patients' OON coverage and right to payment.

93.     As a third-party administrator[19] of ERISA plans, Defendant is in possession of information indicating which health plans are subject to ERISA and which are not. Plaintiff believes that most of the claims at issue in this case are subject to health plans governed under ERISA.

94.     As claims administrator, Defendant makes all claim determinations, decides all benefits questions, processes claims, prices claims and conducts all other functions related to the administration of the health plans for the claims at issue.

95.     Defendant has breached the terms of the ERISA plans and fiduciary duties owed thereunder, by refusing to pay or correctly process the OON substance abuse and mental health claims at issue and as required by the health plans and promised by BCBS.

96.     These breaches include the acts alleged above, administratively obstructing the processing of claims, refusing to pay claims at all, refusing to pay the UCR and/or reasonable and customary rates, or to pay reimbursement rates or recognized charges as provided might have been provided in the plans.

97.     Furthermore, Defendants breached ERISA by making claim determinations (i.e. decisions not to pay - effectively denials or Adverse Benefit Determinations as that term is defined under ERISA and/or underpay) that had no basis in the terms of the plans, without valid evidence or information to substantiate such determination, and in an unreasonable and arbitrary manner.

---

[19] In the case of Michigan insureds, BCBSM may also be the applicable home plan sponsor and insurer and/or plan administrator for these health plans.

98.     Failure to fully and fairly review and administer claims, resulting in non-payment of benefits, illegally withholds benefits due to Plaintiffs as both the attorney in fact and assignees of right to payment.

99.     Accordingly, Plaintiffs are entitled to recover unpaid (and any underpaid) benefits from Defendants.

### Count II – Breach of Contract
**(As attorney-in-fact and assignee of those patients with non-ERISA, state law plans[20])**

100.    Plaintiffs re-allege the factual allegations in paragraphs above 16 through 83, as if fully set forth herein.

101.    Plaintiffs bring Count II pursuant to the laws of Michigan.

102.    Plaintiffs bring this cause of action pursuant to validly executed durable power of attorneys and assignment of benefits that confer standing upon Plaintiff. *See, for example, Henry Ford Health Sys. v. Assurant Health*, No. CIV.A. 08-CV-11270, 2008 WL 1826026, at *1 (E.D. Mich. Apr. 23, 2008).

103.    This cause of action seeks to recover benefits due to Plaintiffs under the terms of those BCBS health plans which were not governed by ERISA, to enforce rights under the terms of the plans, and/or to clarify rights to future benefits under the terms of the plans.

104.    Defendant is in possession of information indicating which plans are subject to ERISA and which are not. Plaintiffs believe that not all of the claims at issue in this case are subject to ERISA.[21]

---

[20] Non-ERISA plans are fully insured ("fully funded") plans subject to state law only. These plans typically include health plans purchased on state exchanges and small employer plans. Only Defendant has knowledge of which plans herein are subject to state law only.

[21] Plaintiffs have treated patients who have coverage through state exchanges and small employer plans as well as those issued by BCBSM for Michigan residents under the BCN network.

105.    Defendant breached the terms of the contract, the insurance plan between itself and the insured, by failing to properly pay benefits due to the Plaintiffs, as assignees, under the terms of the non-ERISA plans.

106.    Defendant was in charge of pricing, processing, and paying all plan claims.

107.    Defendant has breached the terms of the non-ERISA plans by refusing to pay out-of-network substance abuse and mental health claims as required by said plans.

108.    These breaches include the acts alleged above, administratively obstructing the processing of claims, refusing to pay claims at all, refusing to pay the UCR and/or reasonable and customary rates, or to pay prevailing fees or recognized charges or such other rates as provided might have been provided in the non-ERISA health plans.

109.    Defendants breached its duties under the non-ERISA plans by making claim determinations that had no basis in the terms of the plans, without valid evidence or information to substantiate such determination, and in an unreasonable and arbitrary manner.

110.    Defendant's failure to fully and fairly adjudicate claims pursuant to the terms of Member's benefit plans which include coverage for OON substance abuse and mental health treatment services breaches the terms of those plans.

111.    Failure to fully and fairly review and administer claims, resulting in non-payment of benefits, illegally withholds benefits due to Plaintiffs as assignees of right to payment.

112.    Accordingly, Plaintiffs are entitled to recover unpaid (and any underpaid) benefits from Defendants.

### Count III – Violation of Nonprofit Health Care Corporation Reform Act § 550.1402
**(As attorney-in-fact and assignee of all patients)**

113.    Plaintiffs re-allege the factual allegations in paragraphs above 16 through 83, as if fully set forth herein.

26

114.    Plaintiffs bring Count III pursuant to Michigan's Nonprofit Health Care Corporation Reform Act, MCL § 550.1402 (Act).

115.    The Act (MCL §§ 550.1101- 1704) is the enabling legislation for Defendant Blue Cross Blue Shield of Michigan.

116.    The Act mandates requirements for the structure of a Nonprofit Health Care Corporation, specifies required and prohibited acts, and lists requirements for relations between Nonprofit Health Care Corporations and health care facilities.

117.    The Act imposes requirements on Nonprofit Health Care Corporations.

118.    These requirements include:

A health care corporation shall not do any of the following:

(a) Misrepresent pertinent facts or certificate provisions relating to coverage.

(b) Fail to acknowledge promptly or to act reasonably and promptly upon communications with respect to a claim arising under a certificate.

(c) Fail to adopt and implement reasonable standards for the prompt investigation of a claim arising under a certificate.

(d) Refuse to pay claims without conducting a reasonable investigation based upon the available information.

(e) Fail to affirm or deny coverage of a claim within a reasonable time after a claim has been received.

(f) Fail to attempt in good faith to make a prompt, fair, and equitable settlement of a claim for which liability has become reasonably clear.

(g) Compel members to institute litigation to recover amounts due under a certificate by offering substantially less than the amounts due.

(h) By making reference to written or printed advertising material accompanying or made part of an application for coverage, attempt to settle a claim for less than the amount which a reasonable person would believe was due under the certificate.

(i) For the purpose of compelling a member to accept a settlement or compromise in a claim, make known to the member a policy of appealing from administrative hearing decisions in favor of members.

(j) Attempt to settle a claim on the basis of an application which was altered without notice to, or knowledge or consent of, the subscriber under whose certificate the claim is being made.

(k) Delay the investigation or payment of a claim by requiring a member, or the provider of health care services to the member, to submit a preliminary claim and then requiring subsequent submission of a formal claim, seeking solely the duplication of a verification.

(l) Fail to promptly provide a reasonable explanation of the basis for denial of a claim or for the offer of a compromise settlement.

(m)Fail to promptly settle a claim where liability has become reasonably clear under 1 portion of a certificate in order to influence a settlement under another portion of the certificate.
…

(11) In addition to other remedies provided by law, an aggrieved member may bring an action for actual monetary damages sustained as a result of a violation of this section. If successful on the merits, the member shall be awarded actual monetary damages or $200.00, whichever is greater, together with reasonable attorneys' fees. If the health care corporation shows by a preponderance of the evidence that a violation of this section resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid the error, the amount of recovery shall be limited to actual monetary damages.

Mich. Comp. Laws Ann. § 550.1402

119.    The conduct alleged in paragraphs 16 through 83, above clearly show violations of

The Act through Defendant's commission of Prohibited Acts.

120.    Plaintiffs bring this action pursuant to a validly executed assignment of benefits

that confers standing upon Plaintiffs. *See, for example, Henry Ford Health Sys. v. Assurant Health*,

No. CIV.A. 08-CV-11270, 2008 WL 1826026, at *1 (E.D. Mich. Apr. 23, 2008).

121. This cause of action seeks to recover benefits due to Plaintiffs under the terms of those BCBS plans which were not governed by ERISA, to enforce rights under the terms of the plans, and/or to clarify rights to future benefits under the terms of the plans.

122. Defendant is in possession of information indicating which plans are subject to ERISA. Plaintiffs believe that not all of the claims at issue in this case are subject to ERISA.

123. Defendant makes all claims determinations and decides all benefits questions under the non-ERISA plans.

124. Defendant was in control of pricing, processing, and paying all claims.

125. Defendant has breached the terms of the non-ERISA plans by refusing to pay out-of-network substance abuse and mental health claims as required by the health plans.

126. Defendant's Prohibited Acts under The Act include the acts alleged above, including, but not limited to, administratively obstructing the processing of claims, refusing to pay claims at all, refusing to pay the UCR and/or reasonable and customary rates, or to pay prevailing fees or recognized charges or such other rates as provided might have been provided in the plans, misrepresenting plan benefits, failing to conduct reasonable investigations, and failing to failing to implement reasonable standards and guidelines.

127. Failure to fully and fairly review and administer claims, resulting in non-payment of benefits, illegally withholds benefits due to Plaintiffs as assignees of right to payment.

128. Accordingly, Plaintiffs are entitled to recover unpaid (and any underpaid) benefits from Defendants as well as attorney's fees and costs.

### Count IV: Breach of Covenant of Good Faith and Fair Dealing
**(On behalf of Plaintiffs)**

129. Plaintiffs re-allege the factual allegations in paragraphs above 16 through 83, as if fully set forth herein.

130.     This claim is brought pursuant to the laws of the state of Michigan.

131.     Michigan law recognizes an implied covenant of good faith and fair dealing in the performance of all contracts where one party to the contract makes its performance a matter of its own discretion. *See, for example, Warren Prescriptions, Inc. v. Walgreen Co.*, No. 17-10520, 2018 WL 287951, at *2 (E.D. Mich. Jan. 4, 2018). Michigan law also provides that "the covenant of good faith and fair dealing is an implied promise in every contract. *Id.* Discretion arises when the parties have agreed to defer decision on a particular term of the contract.

132.     Plaintiffs and Defendants had both oral and implied contractual relationships arising from prior course of dealing and telephonic verifications of coverage via the VOB process and the pre-authorization/UR review process for services.

133.     Defendant made its performance of its duty to indemnify its beneficiaries and beneficiaries of health plans for which it administered claims wholly a matter of its own discretion when it administratively obstructed the processing of claims, refused to process claims, refused to provide a forum for claims negotiation, refused to provide guidance on the submission of claims, and/or made claims payment determinations unilaterally.

134.     By its discretionary and unilateral refusal to perform its contractual obligation to provide meaningful coverage for substance abuse and mental health services, and as the only party with the discretion to make payments and determinations, Defendant destroyed and injured Plaintiffs' right to receive the fruits of the contract, in the form of proper payment for services provided.

### Count V: Breach of Implied Contract
**(On behalf of Plaintiffs)**

135.     Plaintiffs re-allege the factual allegations in paragraphs above 16 through 83, as if fully set forth herein.

136.    This claim is brought pursuant to the laws of the state of Michigan.

137.    Plaintiffs and Defendant had both oral and implied contractual relationships arising from prior course of dealing and telephonic verifications of coverage the VOB process, and pre-authorization/utilization review process for services.

138.    It is undisputed that no written contract existed between the Plaintiffs in their own right and Defendant. Although Plaintiff BDR did enter into a contract of adhesion with BCBSM to join its "Traditional Network," upon information and belief, none of the services provided by Plaintiffs and sued upon herein are subject to that contract. Further, an implied contract exists where one engages or accepts beneficial services of another for which compensation is customarily made and naturally anticipated. *Rocco v. Michigan Dep't of Mental Health*, 114 Mich. App. 792, 799, 319 N.W.2d 674, 677 (1982), *aff'd sub nom. Ross v. Consumers Power Co.*, 420 Mich. 567, 363 N.W.2d 641 (1984).

139.    Plaintiffs and Defendant entered into an implied contract when Plaintiffs performed healthcare services for Defendant's benefit, or for the benefits of health plans administered by Defendant, where Plaintiffs had a reasonable expectation of being compensated for those services, and Defendant represented that it intended to provide meaningful compensation for those services.

140.    Defendant actually received the benefit of those services because its insureds received care for which it, or one of its Blue Card Program affiliates, were financially responsible.

141.    Defendant's retention of funds that it unreasonably withheld from Plaintiffs for the services Plaintiffs provided is inequitable. Defendant was obligated to compensate Plaintiffs at a reasonable rate of payment for services provided and knew from before its members were admitted by Plaintiffs as patients through VOB and UR calls and other methods that Plaintiffs expected to be compensated or the services they provided.

142.   Michigan law recognizes an implied covenant of good faith and fair dealing in the performance of all contracts where one party to the contract makes its performance a matter of its own discretion. *See, for example, Warren Prescriptions, Inc. v. Walgreen Co.*, No. 17-10520, 2018 WL 287951, at *2 (E.D. Mich. Jan. 4, 2018). Michigan law also provides that "the covenant of good faith and fair dealing is an implied promise in every contract. *Id.* Discretion arises when the parties have agreed to defer decision on a particular term of the contract.

143.   Defendant made its performance of its duty to indemnify its beneficiaries and beneficiaries of plans for which it administered claims a wholly a matter of its own discretion when it administratively obstructed the processing of claims,  refused to process claims, refused to provide a forum for claims negotiation, refused to provide guidance on the submission of claims, and/or made claims payment determinations unilaterally.

144.   By its discretionary and unilateral refusal to perform its contractual obligation to provide meaningful coverage for substance abuse and mental health services, with Defendant as the only party with the discretion to make payments and determinations, Defendant destroyed and injured Plaintiffs' right to receive the fruits of the contract, in the form of proper payment for services provided.

### Count VI – Unjust Enrichment
### (On behalf of Plaintiffs)

145.   Plaintiffs re-allege the factual allegations in paragraphs above 16 through 83, as if fully set forth herein.

146.   This claim is brought pursuant to the laws of the state of Michigan.

147.   Michigan law recognizes that ""[a] quasi-contractual obligation," like a claim for unjust enrichment, "arises when a defendant receives a benefit from a plaintiff which is inequitable

for the defendant to retain." *Currithers v. FedEx Ground Package Sys., Inc.*, No. 04-10055, 2012 WL 458466, at *6 (E.D. Mich. Feb. 13, 2012).

148.     The benefit that Plaintiffs have conferred upon Defendant is the treatment of its plan subscribers without receiving adequate and reasonable payment for services rendered.

149.     Defendant misled Plaintiffs regarding its intent to pay benefits at a reasonable rate for the health insurance services Plaintiffs rendered for the benefit of Defendant insured's and for beneficiaries of plans administered by Defendant.

150.     An inequity has resulted to Plaintiffs because Defendant received the benefit of services provided to its insureds and the benefit of premium payments from Defendant's plan members, along with other enrichments, without proper payment to Plaintiffs for the services provided.

151.     As such, Defendant is unjustly enriched through these actions and it is inequitable to permit Defendant to retain the benefits at the expense of Plaintiffs.

### Count VII: Breach of Oral Contract
#### (On behalf of Plaintiffs)

152.     Plaintiffs re-allege the factual allegations in paragraphs above 16 through 83, as if fully set forth herein.

153.     This claim is brought pursuant to the laws of the state of Michigan.

154.     In a breach of oral contract claim, the essential contractual elements are required: competent parties, proper subject matter, legal consideration, mutuality of agreement, and mutuality of obligation. *Riverside Auto Sales, Inc. v. GE Capital Warranty Corp.*, No. 2:03 CV 55, 2004 WL 2106638, at *16 (W.D. Mich. Mar. 30, 2004).

155.     The parties were both competent to enter into a contractual agreement. The representatives of both parties each made representations and authorizations sufficient to enter into

a contract. Plaintiffs and Defendant entered into an oral contract telephonically during the VOB and UR pre-authorization processes. Plaintiffs subsequent authorization calls and Defendant's authorizations throughout the duration of the patients' care, created additional oral contracts.

156.    The providing of patient services is proper subject matter for a contract.

157.    Simply put, the Plaintiffs offered to provide services to patients, the offer was mutually accepted when Defendant confirmed coverage and issued pre-authorization for services, and Plaintiffs, as consideration, incurred the cost of providing such healthcare services, and subsequently performed those services for the benefit of Defendant who, amongst other enrichments, pocketed premium payments from its insureds.

158.    Plaintiffs were obligated to provide services, which they did in good faith.

159.    Defendant was obligated to pay Plaintiffs a reasonable rate for these services, this they did not do.

160.    Defendant breached the contract when it failed to process claims, failed to pay claims, improperly paid claims it was obligated to reimburse,

161.    Plaintiffs were harmed by Defendant's breach because it bore most if not all of the financial responsibility for the healthcare services Defendant wrongfully refused to pay for.

<u>**Count VIII: Fraudulent Misrepresentation**</u>
**(On behalf of Plaintiffs)**

162.    Plaintiffs re-allege the factual allegations in paragraphs above 16 through 83, as if fully set forth herein.

163.    This claim is brought pursuant to the laws of the state of Michigan.

164.    A claim of fraudulent misrepresentation has six elements: (1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, it knew that it was false, or made the representation recklessly, without any

knowledge of its truth, and as a positive assertion; (4) the defendant made the representation with the intention that it should be acted on by the plaintiff; (5) the plaintiff acted in reliance on the representation; and (6) the plaintiff suffered injury due to his reliance on the representation. *MacDonald v. Thomas M. Cooley Law Sch.*, 724 F.3d 654, 662 (6th Cir. 2013).

165. Defendant fraudulently misrepresented its intent to pay benefits and/or to pay benefits at a reasonable rate in accordance with the health plan terms for the services Plaintiffs rendered for the benefit of Defendant and beneficiaries.

166. During VOB and UR processes, Defendant and/or its agents represented that it intended to pay a reasonable amount for said services. But for this representation, Plaintiffs would have sought other arrangements or referrals for patients.

167. Defendant did not and did not intend to make reasonable payments for services that its plan subscribers received, and its representation of intent to pay a reasonable amount was false.

168. As the facts outline herein, Defendant knew that it did not intend to make reasonable payments for the services provided.. Alternatively, Defendant made its representation of intent to provide reasonable coverage with reckless disregard for the truth of such false representations.

169. Defendant made its representations to Plaintiffs of the intent to provide coverage and payment, with the intent that Plaintiffs would act in reliance of said representation and provide services for its patients. Defendant knew, or should have known, that the existence of meaningful health insurance benefits is a pre-requisite condition for healthcare providers to provide services to patients. Furthermore, when Defendant pre-authorized services, they intended for Plaintiffs to provide the services they authorized.

170.     Plaintiffs agreed to provide healthcare services in reliance on Defendant's representation of its intent to provide reasonable payment of health insurance benefits. But for Defendant's representation, Plaintiffs would have advised patients that they would be responsible for 100% of the cost of their healthcare, and that those patients may be better served by an alternative provider.

171.     Plaintiffs suffered acute damages as a result of Defendant's misrepresentation. Plaintiffs bore most if not all of the cost of providing services for patients. Plaintiffs filled beds with patients whom they would be responsible for financing rather than patients with meaningful health insurance benefits, Plaintiffs were forced to balance bill patients for care those insureds reasonably believed would be covered, and Plaintiffs spent thousands of hours and substantial funds on seeking a reasonable resolution to Defendant's practice of refusing to pay.

### Count IX: Innocent Misrepresentation
### (On behalf of Plaintiffs)

172.     Plaintiffs re-allege the factual allegations in paragraphs above 16 through 83, as if fully set forth herein.

173.     This claim is brought pursuant to the laws of the state of Michigan.

174.     In order to establish a case of innocent misrepresentation, the plaintiff must prove that the misrepresentation occurred between parties in privity and that the representation was false. Plaintiff must further establish that he was actually deceived and that he relied on the misrepresentation to his detriment. Finally, Plaintiff must demonstrate that his loss inured to the benefit of the one who made the misrepresentation. *Phillips v. General Adjustment Bureau*, 12 Mich. App. 16, 20, 162 N.W.2d 301 (1968)

175.    Defendant represented, during VOB and UR pre-authorization calls, that it intended to pay healthcare benefits for the services Plaintiffs provided patients. These actions put the parties in privity.

176.    Defendant made such representations during the formation of an oral contract by which Plaintiffs agreed to perform healthcare services in exchange for Defendant's agreement to pay for such services.

177.    The representations by the Defendant were false as alleged throughout the factual allegations stated herein, as Plaintiffs did not receive proper compensation from Defendant for the services rendered.

178.    Plaintiffs were clearly deceived by Defendant's representations as they provided services to patients solely in reliance upon the assurance that they would be paid.

179.    Plaintiffs relied on the Defendant's representation to their detriment, as they did not receive payment for said and they would not have treated the patients if they had known that they could not expect proper payment for their services.

180.    Plaintiffs lost the benefit of compensation for the services they provided for BCBS plan members, and instead bore most, if not all, of the cost of providing services while the Defendant pocketed premium payments, amongst other enrichments.

181.    Defendant benefited from its false representation because it retained the benefits of proceeds of insurance policies, premiums, increased business or other financial benefits that it wrongly possessed as well as the benefit of free healthcare services provided to its plan subscribers.

### Count X: Promissory Estoppel
**(On behalf of Plaintiffs)**

182.    Plaintiffs re-allege the factual allegations in paragraphs above 16 through 83, as if fully set forth herein.

183.     This claim is brought pursuant to the laws of the state of Michigan.

184.     In Michigan, promissory estoppel is available where (a) the defendant made a promise to the plaintiff that was clear and definite; (b) when the promise was made, the defendant knew or should reasonably have expected that this promise would induce the plaintiff to take some action; (c) the plaintiff did take some action in reliance on the promise; and (d) the plaintiff was damaged as a result of its reliance. *See* M Civ JI 130.01 Promissory Estoppel.

185.     When Plaintiffs conducted VOB and UR authorization calls it obtained clear and definite representations that the BCBS plan subscribers had coverage for substance abuse and mental health services and that those services were medically necessary and eligible for payment for services rendered.

186.     Additionally, When Plaintiffs solicited and obtained information from Defendant's executives regarding proper claims processing, Plaintiffs obtained clear and definite promises to process and pay claims where Plaintiffs met conditions laid out in those conversations.

187.     When Defendant made representations of their intent to process and pay claims where certain conditions were met, they knew or should reasonably have expected Plaintiffs to admit and treat patients who were either defendant's insureds or members of plans administered by Defendant.

188.     Plaintiffs, in reliance on Defendant's promise of coverage, medical necessity and payment, did admit and treat Defendant's plan members and/or members of plans administered by Defendant.

189.     Plaintiffs suffered damages in the form of uncompensated services, lost opportunity to treat patients who would have directly reimbursed Plaintiffs for the healthcare Plaintiffs provided, administrative costs associated with seeking adequate reimbursements, and damages to

goodwill associated with seeking large balance bills from patients thought that their health plan would cover services but who then became responsible for the full cost of treatment.

### Count XI: Quantum Meruit
### (On behalf of Plaintiffs)

190.    Plaintiffs re-allege the factual allegations in paragraphs above 16 through 83,  as if fully set forth herein.

191.    This claim is brought pursuant to the laws of the state of Michigan.

192.    Quantum meruit recovery is available to imply a contract in order to prevent unjust enrichment when one party inequitably receives and retains a benefit from another. *See Martin v. East Lansing School Dist.*, 193 Mich. App. 166, 177, 483 N.W.2d 656 (1992).

193.    To sustain a claim of quantum meruit a plaintiff must establish (a) the receipt of a benefit by the defendant from the plaintiff and (b) an inequity resulting to the plaintiff because of the retention of the benefit by the defendant. *Id.*

194.    Defendant received and retained the benefit of free or illegitimately discounted care which they were contractually obligated to pay at proper rates. Defendant also kept the premiums it had been paid by patients but did not properly pay claims submitted under those plans.  Absent Defendant's representations and promises, Plaintiffs would have directed or referred patients to other providers.

195.    Due to no fault of Plaintiffs but as a direct and consequential result of Defendant's actions, an inequity has resulted as Plaintiffs are left to bear the cost of uncompensated services for which Defendant should have paid under the terms of the health plans and/or the oral and/or implied contracts it made with Plaintiffs. Defendant retains the benefit of free care at Plaintiffs' expense and should not be permitted to do so.

**Count XII: Interest on Unpaid Claims (Clean Claims Act- MCL 500.2006(7) *et seq.*)**
**(On behalf of Plaintiffs)**

196.     Plaintiffs re-allege the factual allegations in paragraphs above 16 through 83,  as if fully set forth herein.

197.     This claim is brought pursuant to the laws of the state of Michigan.

198.     Pursuant to Michigan Insurance Code §§ 500.2006(8)(a) plaintiffs are entitled to interest of 12% *per annum* on clean claims left unpaid for more than 45-days.

199.     Plaintiffs filed clean and timely claims in all cases pursuant to coding practices set forth by the Centers for Medicare and Medicaid Services, BCBS and industry guidelines.

200.     Defendants failed to offer any basis in any health plan' language that justified treating any claims as non-clean.

201.     Plaintiffs were entitled to receipt of full benefits within 45 days of filing claims.

202.     Plaintiffs are therefore entitled to interest of 12% per annum on the outstanding balance owed to them by Defendant.

**Count XIII: Third Party Beneficiary**
**(On behalf of Plaintiffs)**

203.     Plaintiffs re-allege the factual allegations in paragraphs above 16 through 83,  as if fully set forth herein.

204.     This claim is brought pursuant to the laws of the state of Michigan.

205.     Pursuant to Mich. Comp. Laws Ann. §§ 600.1405 Plaintiffs are entitled to recovery in the amount Defendant expressly promised to pay on behalf of its insureds and/or beneficiaries of plans administered by beneficiaries.

206.    Additionally, Michigan recognizes a cause of action for recovery by third party beneficiaries of a contract where a promisor makes an express promise to act or refrain from acting for the benefit of a third party.

207.    Plaintiffs are entitled to recovery as third-party beneficiaries when the following elements are met: a) there was a contract between two parties; b) the contract included a promise to do or refrain from doing something for an expressly identified third party; c) that plaintiff qualifies as the expressly identified third party; d) that the plaintiff did not receive the benefit of the promise; and e) that enforcement the terms of the contract would permit recovery by the promisee in who's shoes plaintiff stands. *See, for example, White v. Taylor Distrib. Co.*, 289 Mich. App. 731, 734, 798 N.W.2d 354, 356 (2010); *Shay v. Aldrich*, 487 Mich. 648, 667, 790 N.W.2d 629, 640 (2010)

208.    Upon information and belief, patients were insured and/or covered under health plans which contractually obligated Defendant to provide coverage for OON services of the exact type that Plaintiffs provided.

209.    Upon information and belief, patients' insurance contracts and/or health plans included a promise to pay for medically necessary services at proper rates that were provided by OON providers such as Plaintiffs. Plaintiffs were the expressly intended recipients of payment under the insurance contracts and/or health plans.

210.    Upon information and belief, the insurance agreements and/or health plans expressly identify OON healthcare providers as intended recipients of payment for covered services.

211.    Plaintiffs did not receive the benefits of compensation promised under the terms of the insurance agreements and/or health plans.

212.    Enforcement of the terms of the insurance agreements and/or certificates of coverage would permit recovery by the promises, in whose shoes Plaintiff stands.

## VII.    Demand for Jury Trial

213.    Plaintiffs demand a trial by jury of all issues so triable.

## VIII.    Conclusion and Prayer for Relief

As a direct and proximate result of the wrongful conduct of the Defendant, in particular, the bad faith refusal to honor contractual obligations, Plaintiffs have been forced to retain attorneys and incur substantial costs and expenses to obtain policy benefits from said Defendants, for which Plaintiff is entitled to be compensated.

WHEREFORE, Plaintiff prays for judgment against the Defendants as follows:

1.    For general, special, restitutionary and compensatory damages according to proof.

2.    For prejudgment interest on amounts of benefits wrongfully withheld.

3.    On the First cause of action, recovery of benefits,, disgorgement of profits, declaratory and injunctive relief and attorney's fees pursuant to 29 U.S.C. § 1132(g).

4.    On the third and fourth causes of action, damages sufficient to put Plaintiffs in as good a position as Plaintiffs would have been had the contract been fully performed.

5.    Punitive damages according to proof upon all causes so actionable.

6.    Recovery of damages in the amount Plaintiff lost in relying on Defendant's promise to cover services.

7.    An injunction prohibiting Defendants from the conduct alleged herein.

8.      Application of 12% per annum interest on any claims Defendant failed to pay within 45 days of their receipt.

9.      Attorneys' fees.

10.     For costs and such other and further relief as the Court may deem appropriate.

**[Signature page follows]**

Dated: July 31, 2019                         Respectfully submitted,

**NAPOLI SHKOLNIK PLLC**

By: */s/ Matthew M. Lavin*

Matthew M. Lavin (DC Bar No. 1046340)
1750 Tysons Boulevard, Suite 1500
McLean, VA 22102
(212) 297-1000/Fax (646) 843-7603
mlavin@napolilaw.com

Aaron R. Modiano (*pro hac vice forthcoming*)
2665 S. Bayshore Drive, Suite 220
Coconut Grove, FL 3313
(212) 297-1000/Fax (646) 843-7603
amodiano@napolilaw.com

**JULIE W. ALLISON, P.A.**

Julie W. Allison (*pro hac vice forthcoming*)
Anelia Shaheed (*pro hac vice forthcoming*)
4601 Sheridan St., Suite 213
Hollywood, FL 33021
(305) 428-1093/Fax (305) 397-2211
julie@allisonlaw.net
anelia@allisonlaw.net

**SLOT LAW GROUP, PLLC**

Phillip B. Slot (MI Bar No. P72960)
77 Monroe Center NW, Suite 700
Grand Rapids, MI 49503
(616) 288-0181/Fax (616) 456-5434
pslot@slotlaw.com