# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

SERENITY POINT RECOVERY, INC., A
FOREVER RECOVERY, BEHAVIORAL
REHABILITATION SERVICES, BEST DRUG
REHABILITATION,

Plaintiffs,

v.

BLUE CROSS BLUE SHIELD OF
MICHIGAN,

Defendant.

_____/

Case No. 1:19-cv-00620
Hon. Janet T. Neff

**ORAL ARGUMENT REQUESTED**

NAPOLI SHKOLNIK PLLC
By: Matthew McGill Lavin (1046340)
1750 Tysons Blvd., Ste. 1500
McLean, VA 22102
(212) 397-1000
MLavin@Napolilaw.com

Attorney for Plaintiffs

_____/

BODMAN PLC
By: Rebecca D'Arcy O'Reilly (P70645)
6th Floor at Ford Field
1901 Saint Antoine Street
Detroit, Michigan 48226
(313) 259-7777
roreilly@bodmanlaw.com

SIDLEY AUSTIN LLP
By: Tacy F. Flint
Kathleen L. Carlson
Elizabeth Y. Austin
One South Dearborn Street
Chicago, Illinois 60603
(312) 853-7000
tflint@sidley.com
kathleen.carlson@sidley.com
laustin@sidley.com

Attorneys for Defendant

## BRIEF IN SUPPORT OF DEFENDANT BLUE CROSS BLUE SHIELD OF MICHIGAN'S MOTION TO DISMISS FOR LACK OF STANDING PURSUANT TO <u>FEDERAL RULES OF CIVIL PROCEDURE 12(b)(1) AND 12(b)(6)</u>

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES…………………………………………………………………...…ii

BACKGROUND ........................................................................................................................... 4

I.    The Parties and the Plans at Issue.................................................................................... 4

II.   The BlueCard Program.................................................................................................... 5

III.  Relevant BCBSM Plan Terms ........................................................................................ 7

  A.   Anti-Assignment Clauses.......................................................................................... 7

  B.   Administrative Review Process ................................................................................. 8

IV.  This Litigation ................................................................................................................. 8

APPLICABLE LEGAL STANDARDS ....................................................................................... 9

ARGUMENT .............................................................................................................................. 10

I.    Plaintiffs Lack Standing To Sue BCBSM Under Section 502(a)(1)(B) Over Benefits
      Provided Or Administered By *Other* Blue Cross Blue Shield Entities. ............................... 10

II.   For BCBSM Customers, Explicit Anti-Assignment Clauses Prohibit Plaintiffs From
      Bringing ERISA Claims On Behalf Of Those Customers. .................................................... 12

  A.   Plaintiffs Are Not "Participants" Or "Beneficiaries" And Thus Do Not Have Standing
        To Bring A Direct Claim With Respect To BCBSM Customers. .................................... 12

  B.   Unambiguous Anti-Assignment Clauses Prohibit Plaintiffs From Claiming Derivative
        Standing On Behalf Of BCBSM Customers.................................................................. 13

  C.   Plaintiffs Cannot Evade The Clear Effect Of The Anti-Assignment Clauses. ................. 15

III.  Plaintiffs Have Not Exhausted Administrative Remedies.................................................... 17

CONCLUSION.......................................................................................................................... 20

i

## **TABLE OF AUTHORITIES**

**Cases**                                                                                                   **Page(s)**

*Am. Orthopedic & Sports Med. v. Indep. Blue Cross Blue Shield*,
    890 F.3d 445 (3d Cir. 2018)......................................................................................17

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...................................................................................................9

*Barnes v. Blue Cross & Blue Shield of Mich.*,
    2009 WL 909551 (E.D. Mich. Mar. 31, 2009) ........................................................10

*Binno v. Am. Bar Ass'n*,
    826 F.3d 338 (6th Cir. 2016) ....................................................................................12

*Borman v. Great Atl. & Pacific Tea Co.*,
    64 F. App'x 524 (6th Cir. 2003) .................................................................17, 18, 19

*Brown v. Bluecross Blueshield of Tennessee, Inc.*,
    827 F.3d 543 (6th Cir. 2016) .......................................................................... *passim*

*Children's Hosp. Med. Ctr. of Akron v. Youngstown Assocs. in Radiology, Inc.*,
    612 F. App'x 836 (6th Cir. 2015) ...............................................................................9

*Coomer v. Bethesda Hosp., Inc.*,
    370 F.3d 499 (6th Cir. 2004) ..............................................................................3, 17

*Farm Bureau Gen. Ins. Co. of Mich. v. Blue Cross Blue Shield of Mich.*,
    2015 WL 4874611 (W.D. Mich. Aug. 13, 2015)....................................................17

*Gore v. El Paso Energy Corp. Long Term Disability Plan*,
    477 F.3d 833 (6th Cir. 2007) ........................................................................2, 11, 12

*Greenberg v. Life Ins. Co. of Va.*,
    177 F.3d 507 (6th Cir. 1999) ......................................................................................5

*Jones v. Select Portfolio Servicing, Inc.*,
    762 F. App'x 526 (6th Cir. 2016) ...............................................................................4

*Kiser v. Reitz*,
    765 F.3d 601 (6th Cir. 2014) ................................................................................9, 10

*Kufner v. Jefferson Pilot Fin. Ins. Co.*,
    595 F. Supp. 2d 785 (W.D. Mich. 2009) ...................................................................1

*Luckey v. Blue Cross Blue Shield of Mich.*,
    2012 WL 2190833 (E.D. Mich. June 14, 2012)................................................14, 15

*Luckey v. Blue Cross Blue Shield of Mich.,*
    5:11-cv-11500-JCO-MJH (Dkt. No. 15) ................................................................14

*Lyshe v. Levy,*
    854 F.3d 855 (6th Cir. 2017) ...........................................................................9

*Madison-Hughes v. Shalala,*
    80 F.3d 1121 (6th Cir. 1996) ...........................................................................9

*Makar v. Health Care Corp. of Mid-Atl. (CareFirst),*
    872 F.2d 80 (4th Cir. 1989) ...........................................................4, 18, 19, 20

*Med. Soc'y of N.Y. v. UnitedHealth Grp. Inc.,*
    2019 WL 1409806 (S.D.N.Y. Mar. 28, 2019) ..........................................17

*Merrick v. UnitedHealth Grp. Inc.,*
    175 F. Supp. 3d 110 (S.D.N.Y. 2016) .......................................................16

*Moore v. Lafayette Life Ins. Co.,*
    458 F.3d 416 (6th Cir. 2006) ...........................................................................9

*N. Cypress Med. Ctr. Operating Co. v. Blue Cross Blue Shield of Tex.,*
    2010 WL 4025967 (S.D. Tex. Oct. 13, 2010) ...........................................6

*Physicians Multispecialty Grp. v. Health Care Plan of Horton Homes, Inc.,*
    371 F.3d 1291 (11th Cir. 2004) .....................................................................14

*Ravencraft v. UNUM Life Ins. Co. of Am.,*
    212 F.3d 341 (6th Cir. 2000) .............................................................3, 18, 20

*Riverview Health Inst. LLC v. Med. Mut. of Ohio,*
    601 F.3d 505 (6th Cir. 2010) .............................................................3, 14, 15

*Smith v. Local No. 25 Iron Workers' Pension Plan,*
    99 F. App'x 695 (6th Cir. 2004) .................................................................20

*Teagardener v. Republic-Franklin Inc. Pension Plan,*
    909 F.2d 947 (6th Cir. 1990) .....................................................................10, 13

*Titus v. Wallick,*
    306 U.S. 282 (1939) .......................................................................................3, 17

*Trinity Health-Mich. v. Blue Cross Blue Shield of S.C.,*
    408 F. Supp. 2d 482 (W.D. Mich. 2005) .................................................3, 14

*United States v. Carroll,*
    667 F.3d 742 (6th Cir. 2012) .........................................................................12

*United States v. Ritchie*,
   15 F.3d 592 (6th Cir. 1994) ................................................................................................10

*Ward v. Alternative Health Delivery Sys., Inc.*,
   261 F.3d 624 (6th Cir. 2001) ........................................................................................9, 13

**Statutes**

29 U.S.C. § 1132(a)(1)(B) ................................................................................... *passim*

**Other Authorities**

29 C.F.R. § 2560.503-1(g) ................................................................................................8

Federal Rule of Civil Procedure 12(b)(1) ........................................................................9

Federal Rule of Civil Procedure 12(b)(6) ........................................................................9

4 Moore's Federal Practice § 17.10 ................................................................................17

Plaintiffs, medical providers in Michigan, filed a thirteen-count complaint against Blue Cross Blue Shield of Michigan ("BCBSM"), with twelve counts grounded solely in state law. The single reed on which Plaintiffs attempt to hang this suit in federal court is Count I, which Plaintiffs purport to bring under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B).[1] But Section 502(a)(1)(B) does not support federal jurisdiction over this suit because it is not applicable to Plaintiffs or their claims. Simply put, Plaintiffs lack standing to sue under ERISA.

Section 502(a)(1)(B) authorizes a plan "participant or beneficiary" to bring suit "to recover benefits due to *him*" or to "enforce *his rights*" "under the terms of *his plan*." 29 USC § 1132(a)(1)(B) (emphasis added). The typical plaintiff in a Section 502(a)(1)(B) claim is a patient who, after fully exhausting the plan's administrative remedies, seeks judicial review of the plan's final benefits decision because the patient alleges that he or she did not receive what he or she was entitled to under the plan. *See, e.g.*, *Kufner v. Jefferson Pilot Fin. Ins. Co.*, 595 F. Supp. 2d 785, 792 (W.D. Mich. 2009).

Plaintiffs here do not seek to use Section 502(a)(1)(B) to obtain judicial review of a patient's final benefits decision based on a fully formed administrative record. Instead they seek to use the provision as a broad authorization for others who are *not* plan participants or beneficiaries to complain to a federal court about their dissatisfaction with the experience of submitting claims to BCBSM. Plaintiffs dislike, for example, that BCBSM allegedly requires them to set out separate services as separate line items in their claims submissions. (Compl. ¶¶47-48.) Plaintiffs also purportedly encountered technical problems when submitting claims. (*Id.* ¶¶ 69-70.) But none of Plaintiffs' arguments speak to *participants'* rights under the terms of

---

[1] Plaintiffs cite other ERISA provisions in their Complaint, including provisions related to treatment of mental health and substance abuse disorders (*see, e.g.*, Compl. ¶¶86-89), but do not allege a violation of any other provision.

1

*participants'* ERISA plans. And administrative exhaustion is a prerequisite to an ERISA claim. These claims thus do not fit within the bounds of Section 502(a)(1)(B). Plaintiffs attempt to shoehorn their dissatisfaction into a Section 502(a)(1)(B) claim by alleging that they are bringing suit on behalf of their patients. Plaintiffs assert they are entitled to do this because of alleged "assignment[s] of benefits" or "powers of attorney" their patients executed in their favor. (Compl. ¶28.) But this assertion does not transform Plaintiffs' dissatisfaction with BCBSM's alleged claims-processing practices into a proper ERISA claim.

*First*, for the overwhelming majority of medical claims at issue, Plaintiffs concede that the patient *was not covered by BCBSM*. According to Plaintiffs' own allegations, 90% of the claims underlying their Complaint relate to patients who were *not* covered by BCBSM, but rather a different Blue Cross and/or Blue Shield carrier. (Compl. ¶33, 12/6/19 Joint Notice (Dkt. 18) ("JN") at PageID.79.) For these patients, BCBSM's role is limited to processing the claims— but an entirely separate entity administers the plan and determines what benefits are owed to plan participants. Neither Section 502(a)(1)(B) nor Article III can support a federal suit to recover plan benefits from an entity that did not issue the plan and has no power to determine what benefits are provided pursuant to the plan. *See Gore v. El Paso Energy Corp. Long Term Disability Plan*, 477 F.3d 833, 842 (6th Cir. 2007). Plaintiffs lack standing to sue BCBSM for benefits provided or administered by *other* carriers.

*Second*, for the small fraction of Plaintiffs' patients who allegedly were covered by BCBSM, Plaintiffs may not bring this suit on their behalf because they do not hold a valid assignment of the patients' rights under the terms of BCBSM's plans. The controlling plan documents state expressly to plan participants: "[Y]ou cannot assign your right to payment from us, claim or cause of action against us to a provider." (*See* Appendix filed herewith ("App'x") at

2

4-5 (setting out complete citations to relevant documents for which multiple versions are supplied).) Courts have repeatedly confirmed that such anti-assignment provisions are enforceable under ERISA and prevent derivative standing by health care providers. *Riverview Health Inst. LLC v. Med. Mut. of Ohio*, 601 F.3d 505, 522 (6th Cir. 2010); *Trinity Health-Mich. v. Blue Cross Blue Shield of S.C.*, 408 F. Supp. 2d 482, 485-86 (W.D. Mich. 2005) (later vacated on joint motion of the parties).

Well aware that BCBSM's plan terms prohibit assignment, Plaintiffs have offered two theories for why they should still be permitted to bring this suit—but courts consistently reject both. Plaintiffs first contend that BCBSM is somehow estopped from relying on the express anti-assignment provision because BCBSM interfaced with Plaintiffs directly, rather than with plan participants. The Sixth Circuit has clearly rejected this argument, refusing "to allow estoppel to override the clear terms of plan documents" like the ones here. *Riverview Health*, 601 F.3d at 521 (quoting *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 404 (6th Cir. 1998)). Nor does it help Plaintiffs to allege that they have "powers of attorney" for their patients in addition to assignments of benefits. A power of attorney allows one person to represent the legal interests of another; it does not give the recipient any rights to do what Plaintiffs attempt to do here: bring their *own* claim on their *own* behalf, seeking their *own* remedy that will benefit only *them*. *Titus v. Wallick*, 306 U.S. 282, 289-90 (1939).

***Finally***, ERISA does not allow Plaintiffs to file a Section 502(a)(1)(B) claim for benefits without first exhausting the statutorily prescribed administrative review process with the benefit plan covering the benefits sought. *Coomer v. Bethesda Hosp., Inc.*, 370 F.3d 499, 504 (6th Cir. 2004). Among other things, this requirement serves to "assemble a factual record which will assist a court in reviewing the fiduciaries' actions." *Ravencraft v. UNUM Life Ins. Co. of Am.*,

3

212 F.3d 341, 343 (6th Cir. 2000) (quoting *Makar v. Health Care Corp. of Mid-Atl. (CareFirst)*, 872 F.2d 80, 83 (4th Cir. 1989)). But that record is entirely absent here and the Complaint is devoid of any allegations that Plaintiffs complied with the plain terms of the formal appeals and grievance policy contained in their patients' plan terms. For this reason as well, Plaintiffs lack standing to sue under ERISA and the Complaint should be dismissed.

## BACKGROUND[2]

### I.    The Parties and the Plans at Issue

BCBSM, the only Defendant named in this action, is a Michigan non-profit mutual insurance company, with headquarters in Detroit. Plaintiffs are Michigan-licensed substance abuse treatment centers. (Compl. ¶¶11-14.)

Plaintiffs allege that they have treated, and sought reimbursement for the treatment of, patients who were covered by PPO plans issued by Blue Cross Blue Shield entities. (Compl. ¶30.) The Complaint alleges that "[s]ome patients treated by Plaintiffs" were covered by BCBSM and that "[o]ther patients had health coverage from other entities in other parts of the country" that license the Blue Cross and Blue Shield trademark. (Compl. ¶¶32-33.) In the Joint Notice submitted to the Court, Plaintiffs put numbers on these two categories, indicating that "[l]ess than 10% of the insurance plans at issue are BCBSM plans," while "the remaining 90% are plans from other [Blue Cross Blue Shield] entities." (JN at PageID.79 (Plaintiffs' Summary).)

The plan terms for the PPO plans issued by BCBSM are set forth in BCBSM's PPO Certificates.[3] The PPO Certificates detail what benefits are due to individuals covered by

---

[2] The allegations in the Complaint are taken as true solely for the purposes of this motion, except where contradicted by the documents referenced therein. *Jones v. Select Portfolio Servicing, Inc.*, 762 F. App'x 526, 531 (6th Cir. 2016).

[3] Defendants produced to Plaintiffs pursuant to the Court's January 13, 2020 Order (Dkt. 21), and attach hereto as Defendant's Exhibits 1-5, the 2015 through 2019 plan certificates for BCBSM PPO plans (the "PPO Certificates"). These PPO Certificates set forth the terms for all

BCBSM, the required co-payments and deductibles, and the relevant exclusions and limitations. For the patients who participated in plans issued by other Blue Cross Blue Shield entities—that is, patients who were not covered by BCBSM—their coverage was supplied by separate entities, not before the Court, over which BCBSM has no control. (Compl. ¶31.) These entities issue their own plans and plan documents, which set out the benefits to which their participants are entitled, including the benefits that are covered, the required payments, and any exclusions and limitations—just as the BCBSM PPO Certificates do for individuals covered by BCBSM.

## II.    The BlueCard Program

For the remaining patients who were *not* BCBSM customers, BCBSM's only connection with those patients was not as their insurer or claims administrator, but as a party to an arrangement among entities within the Blue Cross Blue Shield Association known as the "BlueCard program." (*See* Compl. ¶¶31, 33.[4]) The Southern District of Texas recently described the BlueCard program:

> The Blue Card program governs the relationship among Blue Cross and Blue Shield licensees when a member of one plan receives covered medical care from a provider in a different plan's service area. Under the Blue Card program, a "home" plan—where the patient is insured—adjudicates the claim for benefits and determines how much should be paid. The "home" plan advises the "host" plan—where the provider is located——of that amount. The "host" plan then issues payment to the provider, and the

---

BCBSM PPO plans from 2016 through 2019. (*See* Declaration of Lisa Slicker, filed herewith ("Decl."), at 2.) These PPO Certificates thus govern the benefits of all individuals covered by BCBSM whose claims are at issue here. (*See* Compl. ¶21 (alleging that all claims at issue arose from PPO plans); *id.* ¶64 (stating that Plaintiffs do not challenge the treatment of any claims prior to April 2016). The Certificates setting forth plan terms are incorporated into the Complaint because they are referenced throughout the Complaint and central to Plaintiffs' claims. *Greenberg v. Life Ins. Co. of Va.*, 177 F.3d 507, 514 (6th Cir. 1999) (insurance policies "referred to throughout the complaint" and "central to the . . . claims" are not "matters outside the pleadings").

[4] Documents setting out relevant terms of the BlueCard program were produced to Plaintiffs on February 10, 2020 pursuant to the Court's January 13, 2020 Order (Dkt. 21). (*See* D.Exs. 6-15, *see also* Decl. at ¶¶6-8.)

"home" plan reimburses that payment through the Central Financing Agency (CFA).

*N. Cypress Med. Ctr. Operating Co. v. Blue Cross Blue Shield of Tex.*, 2010 WL 4025967, at *1 (S.D. Tex. Oct. 13, 2010). In other words, the "Host Plan" communicates with providers, while the "Home Plan" sets the plan terms and determines what benefits will be paid. This structure is illustrated in the chart provided at Defendant's Exhibits 11-14 hereto.  (*See* App'x at 2-3.)

Because Plaintiffs are Michigan-based providers, when they submit claims on behalf of patients who are covered by Blue Cross Blue Shield entities in other states, BCBSM is the "Host Plan" and Plaintiffs submit the claims to BCBSM under the BlueCard program. (Compl. ¶31.) As the "Host Plan," BCBSM has certain responsibilities related to interfacing with providers and providing certain pricing information. (*See* App'x at 2 (Claims Flow Chart).) But BCBSM does not have any responsibility for "adjudicat[ing] the claim[s]" of participants in other plans. (*See* App'x at 2 ("The Control/Home Plan adjudicates claims received from Par/Host Plans.").)  It is the patients' "Home Plans" (the plans in which they participate) that are responsible for adjudication, *i.e.*, "determining whether the member is eligible, which services are covered and the status of the member's liability for deductibles, coinsurance and copayments." (*Id.*) "Home Plans" also determine the ultimate benefits to be paid. (*Id.* (the "Home Plan" "calculate[s] member and Plan liability amounts" and transmits the disposition to the "Host Plan"), App'x at 2 ("The Control/Home Plan is responsible for computing all claim payment amounts based on its adjudication results").)

While BCBSM supplies a potential rate to the patients' "Home Plans," it is the Home Plans that ultimately decide whether that rate is applicable. (App'x at 3 ("The . . . Home Plan is responsible for computing all claim payment amounts based on its adjudication results, *pricing*

*input from the Par/Host Plan* and its UPF and NLDM software and procedures." (emphasis

added)); *see also* Compl. ¶¶34 (acknowledging that "[i]n all instances, it is the reimbursement

schedule specified by the 'home plan,' or rates as defined within the plan documents issued by

the 'home' plan, which control"), 61 (BCBSM is "required to honor the plan terms of every

patient's specific 'home' health plan").) And once the Home Plans have determined the rate,

while BCBSM transmits the payment to the provider, it is the Home Plan that is financially

responsible for the claim. (*See* App'x at 3-4 ("Home Licensee must reimburse the []Host

Licensee for authorized payments made to the []Host Licensee's providers").) The BlueCard

program does not grant BCBSM (or any other entity) any control over the decisions of the

participants' Home Plans, and the Home Plans remain ultimately responsible to their own

participants with respect to the terms of their participants' plans. (D.Ex. 15 at

BCBSM_SPR_001427.)

## III.   Relevant BCBSM Plan Terms

The remaining fraction of patients that Plaintiffs treated were participants in BCBSM

PPO plans, which are governed by the PPO Certificates. Those PPO Certificates include two

principal terms relevant to this litigation: (1) the anti-assignment clauses, relevant to Plaintiffs'

arguments regarding their ability to sue on behalf of their patients, and (2) the formal appeal

process, relevant to Plaintiffs' arguments regarding exhaustion of administrative remedies.

### A.   Anti-Assignment Clauses

The PPO Certificates attached as Defendant's Exhibits 1-5 cover each year at issue in the

Complaint and thus all potential plan designs at issue here. (*See supra* n. 2.) Each contains an

unambiguous anti-assignment clause explicitly prohibiting participants from assigning to

providers, like Plaintiffs here, their right to payment or any claim or cause of action against

BCBSM. The 2016 Simply Blue Group Benefits Certificate LG provides, for example, that

7

"Benefits covered under this certificate are for your use only. They cannot be transferred or assigned. Any attempt to assign them will automatically terminate all your rights under this certificate. Also, *you cannot assign your right to payment from us, claim or cause of action against us to a provider*." (D.Ex. 2 at BCBSM_SPR_000519 (emphasis added).) Other certificates are materially identical. (*See* App'x at 4-5.) The PPO Certificates further provide: "We will not pay a provider except under the terms of this certificate." (*Id.*)

### B.     Administrative Review Process

Each of the BCBSM PPO Certificates also contains provisions setting out a "formal grievance and appeals process." (App'x at 6-7.[5]) In each instance, the standard appeal process requires a written submission *to the BCBSM appeals unit*, and participation in an in-person or telephonic conference. None of the Certificates state that a provider's "re-submi[ssion of] . . . claims to BCBSM"—the sole appeal-related actions Plaintiffs allege they took here (Compl. ¶¶45, 66 )—suffices to satisfy the requirement of a formal appeal. The administrative review process results in a written benefit decision by BCBSM as required under 29 C.F.R. § 2560.503-1(g). The Complaint does not allege that any such written decision exists with respect to any of the claims at issue here.

## IV.   This Litigation

Plaintiffs filed the Complaint on July 31, 2019. On August 26, 2019, Defendants timely filed a Request for Pre-Motion Conference. After further submissions and a Pre-Motion Conference, the Court ordered the parties to, among other things, "devise a plan for proceeding with resolution of the ERISA claim in the most expeditious manner." (November 15, 2019 Order at 1 (Dkt. 17).) The parties filed a Joint Notice (Dkt. 18), and on January 13, 2020 (Dkt. 21), the

---

[5] All facts in this Section II.B. are drawn from the Certificate pages referenced on pages 6-7 of the Appendix unless otherwise stated.

Court ordered the parties to (1) "exchange power of attorney and anti-assignment exemplars, and any others," which they have done, and (2) "proceed with briefing Defendant's motion to dismiss based on standing to pursue the ERISA claim." In accordance with the Court's Order, this brief sets out BCBSM's arguments solely with respect to Plaintiffs' standing to pursue Count I.

## APPLICABLE LEGAL STANDARDS

A plaintiff's lack of standing with respect to a cause of action, whether statutory standing under ERISA or Article III standing, deprives this Court of subject matter jurisdiction to hear that cause of action. *Ward v. Alternative Health Delivery Sys., Inc.*, 261 F.3d 624, 626 (6th Cir. 2001) ("Standing [in an ERISA case] is thought of as a 'jurisdictional' matter, and a plaintiff's lack of standing is said to deprive a court of jurisdiction."); *Lyshe v. Levy*, 854 F.3d 855, 857 (6th Cir. 2017) ("Whether a party has standing is an issue of the court's subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1)."); *see also Children's Hosp. Med. Ctr. of Akron v. Youngstown Assocs. in Radiology, Inc.*, 612 F. App'x 836, 836-37 (6th Cir. 2015) (reversing lower court decision to reach the merits because defendants' challenge to plaintiff's ERISA standing based on anti-assignment clauses is jurisdictional).[6]

"When subject matter jurisdiction is challenged under Rule 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion." *Madison-Hughes v. Shalala,* 80 F.3d 1121, 1130 (6th Cir. 1996). Challenges to subject matter jurisdiction based on lack of

---

[6] When questions of plaintiff's statutory standing are intertwined with whether plaintiff has stated a claim, the Court can take jurisdiction in order to dismiss for failure to state a claim. *Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416, 440-45 (6th Cir. 2006). Accordingly, in addition to moving pursuant to 12(b)(1), BCBSM is also moving to dismiss under 12(b)(6). BCBSM believes that the Plaintiffs' claims of ERISA standing are "so insubstantial" that they do not give rise to subject matter jurisdiction. *Id.* at 445. But dismissal is proper, in any event, because the Complaint fails to include "sufficient factual matter, accepted as true, to state a claim [for] relief that is plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), which is the standard applied to a facial challenge under Rule 12(b)(1). *Kiser v. Reitz*, 765 F.3d 601, 606 (6th Cir. 2014).

standing generally fall into two categories: facial attacks and factual attacks. *United States v. Ritchie,* 15 F.3d 592, 598 (6th Cir. 1994). "A facial attack is a challenge to the sufficiency of the pleading itself." *Id.* (emphasis omitted). On such motion, the trial court must take the allegations of the complaint as true and construe them in favor of the plaintiff. *See Kiser v. Reitz*, 765 F.3d 601, 606 (6th Cir. 2014). However, the Court need not credit "*legal* allegations" regarding Plaintiffs' status as "participants" or "beneficiaries" under Section 502(a)(1)(B); instead, the Court must "examine[] the terms of the Plan in regard to these allegations" and determine whether Plaintiffs have demonstrated their entitlement to sue under the provision. *Teagardener v. Republic-Franklin Inc. Pension Plan*, 909 F.2d 947, 953 (6th Cir. 1990).

A factual attack, on the other hand, "is not a challenge to the sufficiency of the pleading's allegations, but a challenge to the factual existence of subject matter jurisdiction." *Ritchie*, 15 F. 3d at 598. In deciding such motion, the allegations of the complaint receive no presumption of truth. *Id.* "[T]he court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Id*. Here, BCBSM moves to dismiss for lack of standing "both facially (that is, on the facts as pleaded) and factually (that is, on the facts as they really are)." *Barnes v. Blue Cross & Blue Shield of Mich.*, 2009 WL 909551, at *5 (E.D. Mich. Mar. 31, 2009).

## ARGUMENT

I.     **Plaintiffs Lack Standing To Sue BCBSM Under Section 502(a)(1)(B) Over Benefits Provided Or Administered By *Other* Blue Cross Blue Shield Entities.**

Plaintiffs concede that approximately 90% of the plans they claim to sue under are *not BCBSM plans*, and were instead issued by separate, non-BCBSM entities. (*See* JN at PageID.79; *see also*, *e.g.*, Compl. ¶¶33, 39, 43-44, 46, 65, 75-78.) In other words, BCBSM did not issue those plans, does not control what benefits are paid under those plans, and cannot enforce the terms of those plans. (D.Ex. 15 at BCBSM_SPR_001427 (The plans "remain[] responsible for

10

fulfilling [their] contractual obligations to" their participants).) Thus, neither Section

502(a)(1)(B) nor Article III supports a federal claim *against BCBSM* for benefits under the terms

of those plans, which are controlled by other, separate entities.

Under the well-established law of the Sixth Circuit, only the entity actually responsible

for "control[ling] administration of a plan" is the "proper party defendant in an action concerning

benefits" under Section 502(a)(1)(B). *Gore*, 477 F.3d at 842 (quoting *Daniel v. Eaton Corp.*,

839 F.2d 263, 266 (6th Cir. 1998)). Where an entity is not "responsible for the denial of benefits"

under the terms of a plan, it cannot be sued under Section 502(a)(1)(B). *Id.* Here, BCBSM *does*

*not decide* when to grant or deny benefits under other entities' plans, and thus cannot be sued for

benefits due under those other entities' plans. Only those plans—not BCBSM—are responsible

for controlling plan administration and denying benefits.

Plaintiffs point to BCBSM's role in its function as the "Host Plan" (Compl. ¶31)—but the

fact that BCBSM interfaced with *providers* (like Plaintiffs here) and supplied certain pricing

information (*see supra* at 6, App'x at 2-3), does not mean that BCBSM determined the benefits

that *participants* received under the terms of their plans. *See* 29 U.S.C. § 1132(a)(1)(B)

(providing a cause of action to recover "benefits due to [a participant or beneficiary] under the

terms of his plan"). In fact, Plaintiffs admit that the "plan terms" of the patients' own plans, not

any decision by BCBSM, set forth what the patients were entitled to receive. (Compl. ¶¶34, 61.)

And the BlueCard documents demonstrate that the patients' own plans also were responsible for

both "adjudicating" the patients' claims to benefits under the terms of their plans, and for

determining the patients' ultimate payment amount. (*See supra*, at 5-7, App'x at 2-3.)

Accordingly, because BCBSM neither "control[led] the administration of the plan" nor was

"responsible for the denial of benefits," BCBSM is not the "proper party" to sue here. *Gore*, 477
F.3d at 842.

For similar reasons, the patients' alleged failure to be reimbursed according to the plan
terms is not "fairly traceable" to BCBSM, and accordingly there is no Article III "causation"
with respect to BCBSM. *Binno v. Am. Bar Ass'n*, 826 F.3d 338, 344 (6th Cir. 2016) (citing *Lujan
v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) ("To establish Article III standing, the
plaintiff must allege that: (1) he has suffered an injury-in-fact…; (2) the injury is fairly traceable
to the defendant's conduct; and (3) it is likely that the injury will be redressed by a favorable
decision.")). Likewise, because BCBSM lacks power to grant benefits under other entities' plans,
BCBSM cannot redress Plaintiffs' purported injury of receiving insufficient reimbursement
according to the terms of those plans. It is only those other plans—not BCBSM—that can
provide benefits due under the terms of those plans. Accordingly, Plaintiffs cannot establish
Article III "redressability." *Id.*; *United States v. Carroll*, 667 F.3d 742, 745-46 (6th Cir. 2012)
("Redressability and causation problems often go hand in hand: If a plaintiff fails to sue the
entity causing its injury, a judgment is unlikely to do him any good.").

## II.     For BCBSM Customers, Explicit Anti-Assignment Clauses Prohibit Plaintiffs From Bringing ERISA Claims On Behalf Of Those Customers.

With respect to the patients who are BCBSM customers, Plaintiffs argue that they are
permitted to bring claims on those patients' behalf as a result of assignments or powers of
attorney their patients allegedly executed. This argument fails for multiple reasons.

### A.     Plaintiffs Are Not "Participants" Or "Beneficiaries" And Thus Do Not Have Standing To Bring A Direct Claim With Respect To BCBSM Customers.

Section 502(a)(1)(B) of ERISA permits only a "participant or beneficiary" to bring a
claim. *See also Brown v. Bluecross Blueshield of Tennessee, Inc.*, 827 F.3d 543, 545 (6th Cir.
2016) ("ERISA's civil enforcement provision empowers only plan participants and beneficiaries

12

to bring suit to recover their benefits under a plan"); *Teagardener*, 909 F.2d at 951; *Ward*, 261

F.3d at 627. Plaintiffs do not allege that they are participants in any BCBSM plan, and "[t]he

Sixth Circuit has long rejected" the argument that providers qualify to sue directly under ERISA

as beneficiaries because the providers' claim to payment "is a function of how the insurer

reimburses healthcare providers," and has nothing to do with any benefit that the *patient* is

entitled to under the plan. *Brown*, 827 F.3d at 546 (quoting, in part, *Rojas v. Cigna Health & Life

Ins. Co.*, 793 F.3d 253, 257–58 (2d Cir. 2015)). The Complaint here illustrates that principle

because it asserts allegations related to the *providers'* experience in seeking reimbursement from

BCBSM, and does not include even a single allegation that any *participant* actually was unhappy

with the benefits provided under the terms of their BCBSM PPO Certificates.[7]

### B.  Unambiguous Anti-Assignment Clauses Prohibit Plaintiffs From Claiming Derivative Standing On Behalf Of BCBSM Customers.

Plaintiffs argue that if they cannot sue directly under ERISA, they are entitled to

derivative standing. (Compl. ¶28, Pre-Motion Resp. (Dkt. 11) at PageID.68.) Derivative standing

"confers upon the holder of a valid assignment standing to sue in place of the assignor." *Brown*,

827 F.3d at 546 (quoting *Misic v. Bldg. Serv. Emps. Health & Welfare Tr.*, 789 F.2d 1374, 1378

(9th Cir. 1986) (quotation marks omitted). In order for a provider to obtain derivative standing to

sue under ERISA on behalf of a patient, the patient must "actually convey[]" to the provider "a

valid assignment of benefits under the plan." *Id.* (quoting *Cromwell v. Equicor–Equitable HCA

Corp.*, 944 F.2d 1272, 1277 (6th Cir. 1991)).

---

[7] Indeed, where the Complaint includes allegations about BCBSM participants' claims, the allegations are either wholly conclusory (*see, e.g.*, Compl. ¶44 (alleging, with no further explanation, that 22,000 claims were "underpaid and/or improperly processed")), or consist of quibbles with BCBSM's rates (*see, e.g. id.* ¶¶75-78 (alleging that BCBSM rates were "unreasonably low" because they purportedly were lower than the in-network rates for other states))—a concern that participants may not share with their providers since a higher rate for a provider could mean the participant's share of the payment actually goes up (*see, e.g.*, *id.* ¶25).

Plaintiffs have no such valid assignment because each of the PPO Certificates at issue contains an express and unambiguous anti-assignment clause. (*See supra* at 8, App'x at 4-5.) Plaintiffs argue that "such provisions . . . typically contain ambiguities that render them unenforceable" (Pre-Motion Resp. at PageID.68-69), but there is nothing ambiguous about the provisions here—they explicitly state that neither a participant's "right to payment" from BCBSM, nor its "claim or cause of action" may be assigned to any provider.

Indeed, Plaintiffs' arguments are directly contradicted by the case Plaintiffs themselves have relied on, *Luckey v. Blue Cross Blue Shield of Mich.*, 2012 WL 2190833, at *3 (E.D. Mich. June 14, 2012). (*See* Pre-Motion Resp. at PageID.69.) There, the Eastern District of Michigan held that, contrary to Plaintiffs' arguments, "[a]nti-assignment clauses in ERISA plans are generally enforceable." *Luckey*, 2012 WL 2190833, at *3. And it held a substantially similar anti-assignment clause, stating that "[n]o right to payment from BCBSM, claim or cause of action against BCBSM may be assigned by you to any provider," to be unambiguous and enforceable. Defendants' Motion to Dismiss Brief, *Luckey v. Blue Cross Blue Shield of Mich.*, 5:11-cv-11500-JCO-MJH (Dkt. No. 15), at PageID.1020 (E.D. Mich. Oct. 26, 2011) (quoting clause language); *see also Riverview Health,* 601 F.3d at 520 (upholding dismissal where plaintiffs' claims "were barred because of the anti-assignment provision in Medical Mutual's health care certificates").

The reasoning behind this principle is simple: As this Court has explained, as a matter of statutory interpretation, "most, if not all courts have agreed that," in drafting the ERISA statute, "Congress left the determination regarding the assignability or non-assignability of ERISA benefits to the parties." *Trinity Health-Michigan,* 408 F. Supp. 2d at 486; *see also Physicians Multispecialty Grp. v. Health Care Plan of Horton Homes, Inc.*, 371 F.3d 1291, 1295 (11th Cir.

2004) ("[T]he majority of federal courts [] have concluded that an assignment is ineffectual if the plan contains an unambiguous anti-assignment provision."). Because Plaintiffs do not "hold[] . . . a valid assignment," they do not qualify for derivative standing to sue under Section 502(a)(1)(B). *Brown*, 827 F.3d at 546.

### C.   Plaintiffs Cannot Evade The Clear Effect Of The Anti-Assignment Clauses.

Plaintiffs have argued that, despite the unambiguous anti-assignment clauses prohibiting assignment of these claims to them, they should still be permitted to bring a lawsuit on behalf of BCBSM participants because either (1) BCBSM is purportedly estopped from enforcing the anti-assignment clauses because of the "course of dealing of the parties" or (2) the powers of attorney that Plaintiffs allegedly received from their patients should somehow trump the anti-assignment clauses. (Pre-Motion Resp. at PageID.69.) Both arguments fail.

*Estoppel.* Plaintiffs first argue that BCBSM is "estopped" from relying on its anti-assignment clauses based on the course of dealing of the parties. (Pre-Motion Resp. at PageID.68.) The Sixth Circuit has rejected this exact argument, holding that "to allow estoppel to override the clear terms of plan documents would be to enforce something other than the plan documents themselves." *Riverview Health*, 601 F.3d at 521 (quoting *Sprague*, 133 F.3d at 403).[8] That principle has particular force here, where the only "course of dealing" that Plaintiffs have alleged is that they submitted their claims directly to BCBSM for payment and asked BCBSM to reconsider some claims. (*See, e.g.*, Compl. ¶¶38, 66.) Permitting a provider to submit claims directly for payment, or paying a provider directly, is not "conduct or language" amounting to a representation that BCBSM is treating the provider as an assignee, as is required for a claim of estoppel. *See Riverview Health*, 601 F.3d at 521 (setting out the factors required for estoppel:

---

[8] Plaintiffs argue that *Luckey*, 2012 WL 210833, at *3, is to the contrary, but the Court in that case did not cite or distinguish *Riverview Health*, which is controlling Sixth Circuit precedent.

"(1) there must be conduct or language that amounts to a representation of material fact; (2) the party to be estopped must be aware of the true facts; (3) the party to be estopped must have the intent that the representation be acted on or the party seeking estoppel must reasonably believe that the party to be estopped so intends; (4) the party asserting estoppel must be unaware of the true facts; and (5) the party seeking estoppel must reasonably or justifiably rely on the representation to his detriment").

To the contrary, "it is entirely routine for a health insurance company to pay a healthcare provider directly for services rendered under the plan"—but that right to payment under the plan is not an assignment of benefits under the plan. *Merrick v. UnitedHealth Grp. Inc.*, 175 F. Supp. 3d 110, 121 (S.D.N.Y. 2016) (rejecting estoppel theory of ERISA standing); *see also Brown*, 827 F.3d at 546 (providers' claim to payment "is a function of how the insurer reimburses healthcare providers," not a benefit to which a participant is entitled). Indeed, the anti-assignment clauses explicitly contemplate this distinction: each states that assignment is not permitted, and BCBSM will not pay providers, "*except under the terms of this certificate*." (App'x at 5-6 (emphasis added).)

***Powers of Attorney.*** Plaintiffs have also asserted that, even if an actual assignment is prohibited by an anti-assignment clause, a power of attorney nonetheless plays the role of an assignment, permitting Plaintiffs to bring claims for themselves. (Pre-Motion Resp. at PageID.68.) But Plaintiffs' argument rests on a misunderstanding of the operation of a power of attorney. An assignment, if valid, conveys ERISA standing by transferring the participant's interest in the claim to the provider, permitting a provider to "stand in the shoes of the beneficiary" in bringing the claim and seek relief for the provider itself. *Brown*, 827 F.3d at 548. A power of attorney, by contrast, does not transfer the participants' interest in the claim; instead

"[a] power of attorney . . . simply confers on the agent the authority to *act on behalf of the principal*" and to seek relief on behalf of the principal. *Am. Orthopedic & Sports Med. v. Indep. Blue Cross Blue Shield*, 890 F.3d 445, 455 (3d Cir. 2018) (emphasis added) (cited Pre-Motion Resp. at PageID.68). It does not entitle the agent to bring suit in his or her own name or to recover damages *for him or herself*. *Id.* (power of attorney does not "operate as an assignment to vest the attorney with such title or interest as will enable him to maintain the suit in his own name" (quoting *Titus*, 306 U.S. at 289-90)); 4 Moore's Federal Practice § 17.10 ("An attorney-in-fact is not a real party in interest. The attorney is merely an agent of the real party in interest[.] . . . Thus, the attorney-in-fact cannot bring suit in its own name."); *see also Med. Soc'y of N.Y. v. UnitedHealth Grp. Inc.*, 2019 WL 1409806, at *13 (S.D.N.Y. Mar. 28, 2019) ("Plaintiffs are not acting as the authorized representatives of the patients" where "neither the case caption nor the operative complaint indicates that Columbia brings this action on behalf of those nineteen plaintiffs as their representative"). Plaintiffs here have sued in their own names, seeking recovery for damages to which they allege *they* are entitled. (*See, e.g.*, Compl. at 42 (stating "*Plaintiff* is entitled to be compensated" and seeking "[r]ecovery of damages in the amount *Plaintiff* lost") (emphasis added).) They have no authority under the powers of attorney to do so.

## III.   Plaintiffs Have Not Exhausted Administrative Remedies.

Even if Plaintiffs could somehow overcome the anti-assignment provisions, they have failed to satisfy another threshold requirement for Section 502(a)(1)(B) claims: ERISA requires exhaustion of administrative remedies before bringing suit. *Coomer*, 370 F.3d at 504 ("ERISA requires a participant to exhaust his or her administrative remedies prior to commencing suit in federal court."); *Borman v. Great Atl. & Pacific Tea Co.,* 64 F. App'x 524, 528 (6th Cir. 2003) (affirming dismissal because plaintiff "failed to exhaust his available administrative remedies"); *see also Farm Bureau Gen. Ins. Co. of Mich. v. Blue Cross Blue Shield of Mich.*, 2015 WL

4874611, at *5 (W.D. Mich. Aug. 13, 2015) (Neff, J.) ("The Sixth Circuit has extended ERISA's administrative exhaustion requirement to assignees of participants or beneficiaries."), *aff'd,* 665 F. App'x 483 (6th Cir. 2016). The exhaustion requirement, which requires plan participants to exhaust the plan's own "remedial provisions" prior to bringing suit, *Makar*, 872 F.2d at 83, "enables plan fiduciaries to efficiently manage their funds; correct their errors; interpret plan provisions; and assemble a factual record which will assist a court in reviewing the fiduciaries' actions." *Ravencraft*, 212 F.3d at 343 (quoting *Makar*, 872 F.2d at 83). Administrative appeals thus ensure both that plan participants have an efficient means for recovering benefits, and that—where litigation follows—a court has a complete record of the parties' dispute.

When the exhaustion requirement has not been satisfied, the Court is at a significant disadvantage in adjudicating the claims: in such cases "[t]here is virtually no factual record to assist this court in reviewing appellants' claims," the defendants "have not had the opportunity to define the relevant issues or to apply the relevant plan provisions," and the Court cannot determine whether plaintiffs "are deserving of benefits because they have not yet had an opportunity to establish their eligibility within the framework of the plans." *Makar*, 872 F.2d at 83 (finding dismissal appropriate for failure to exhaust administrative remedies). All of those factors are present here—there is virtually no information about any patient's claims or why Plaintiffs believe each claim was not properly resolved under the terms of the plan. (*See, e.g.*, Compl. ¶44 (alleging, conclusorily, that "22,000 claims . . . were underpaid and/or improperly processed").) Accordingly, where, as here, Plaintiffs have "failed to evince, or even allege, that [they] had made any effort to adhere to [the plan's] formal written internal benefit claim and review procedures," the Court should dismiss the Complaint. *Borman*, 64 F. App'x at 528; *see*

*also Makar*, 872 F.2d at 82 (dismissal without prejudice appropriate where plaintiffs sought reimbursement but "did not fully avail themselves of the procedures provided by [the] plans").

It is evident from the face of the Complaint, and the PPO Certificate documents incorporated by reference therein (*see supra* at 5 n.4), that Plaintiffs have not followed the "formal grievance and appeals" process set out by BCBSM. (*See supra* at 8, App'x at 6-7.) In order to formally appeal, Plaintiffs were required to submit a written statement to the BCBSM appeals unit and participate in an in-person or telephonic conference before they would receive a final written decision by BCBSM. (App'x at 6-7.) The Complaint affirmatively alleges that Plaintiffs did not do any of this. Instead, the Complaint asserts that Plaintiffs exhausted their remedies because they have "re-submitt[ed] claims" or "call[ed] BCBSM regarding each denied claim . . . request" to discuss matters regarding the claim submission, such as which claim number should apply. (Compl. ¶¶66, 70.) The Complaint does not allege the necessary written statement to the appeals unit, nor any written decision by BCBSM. As a consequence, the Court does not have the benefit of any explanation from BCBSM as to why the claims were allegedly denied or underpaid, much less a written explanation of each decision. Critically, the alleged participants here also do not have the benefit of BCBSM' review of their claims in a formal appeal process—which includes reviewing whether those claims were subject to over-billing, failure to observe limitations on balance-billing, and other important determinations that protect plan participants and beneficiaries from improper medical bills—and there is no indication in the Complaint that they are even aware of Plaintiffs' attempt to short-circuit that process on their behalf.  This is fatal to Plaintiffs' claims. *Borman*, 64 F. App'x at 528 (dismissal appropriate where plaintiff "vaguely alleged . . . that he had engaged in a 'lengthy period' of fruitless

discussions concerning his benefit claims in controversy, and had filed . . . [an] unspecified claim").

Finally, Plaintiffs allege conclusorily that "further attempts to exhaust appeals and administrative remedies would be futile." (Compl. ¶45.) This cannot be true because Plaintiffs have not even attempted to begin the administrative review process. And in any event, in order to demonstrate futility, Plaintiffs must "show that the review procedures are insufficient or unfair, or that an available remedy is inadequate." *Ravencraft*, 212 F.3d at 343; *see also Makar*, 872 F.2d at 83 (upholding dismissal where complaint's "bare allegations of futility are no substitute for the 'clear and positive' showing of futility" courts have required); *Smith v. Local No. 25 Iron Workers' Pension Plan*, 99 F. App'x 695, 698-99 (6th Cir. 2004). Plaintiffs have not even made reference to BCBSM's formal review procedures in their Complaint, much less explain why they are "insufficient," "unfair," or "inadequate."

## <u>CONCLUSION</u>

For the reasons set forth herein, Plaintiffs lack standing to bring their ERISA claim, and it should be dismissed. Because the ERISA claim is the only federal claim brought by Plaintiffs, the Court should decline to exercise supplemental jurisdiction over the remaining state law claims, which should also be dismissed.